[Cite as *State v. Jack*, 2014-Ohio-380.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 99499**

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## TAVIO JACK

DEFENDANT-APPELLANT

## JUDGMENT:
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-560076

**BEFORE:** McCormack, J., Stewart, P.J., and Boyle, A.J.

**RELEASED AND JOURNALIZED:** February 6, 2014

**ATTORNEY FOR APPELLANT**

Russell S. Bensing
1350 Standard Building
1370 Ontario Street
Cleveland, OH 44113


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor

By: Kristin Karkutt
Assistant County Prosecutor
9th Floor, Justice Center
1200 Ontario Street
Cleveland, OH   44113

TIM McCORMACK, J.:

**{¶1}** Defendant-appellant, Tavio Jack, appeals from a judgment of the Cuyahoga County Court of Common Pleas convicting him of aggravated burglary, kidnapping, rape, and having weapons while under disability. On appeal, he argues that his convictions are against the manifest weight of the evidence and the trial court failed to merge aggravated burglary and rape for sentencing. After a careful review of the record and applicable law, we affirm his convictions. We further conclude that the aggravated burglary and rape offenses are not allied offenses subject to merger. Accordingly, we affirm the trial court's decision.

## Substantive Facts and Procedural History

**{¶2}** Based on an incident on September 29, 2011, Jack was indicted for four counts: aggravated burglary, kidnapping, rape, and having weapons while under disability. The first three counts included firearm specifications. The case was bound-over from the juvenile court, as Jack was two weeks shy of 18 when the incident occurred. In addition, Jack was evaluated by the Court Psychiatric Clinic and Northcoast Behavioral Center, as well as an independent psychological expert requested by the defense, and found to be sane at the time of the offenses and competent to participate in the proceedings.

**{¶3}** Jack pleaded not guilty to the charges. The matter proceeded to a jury trial, except for the having weapons while under disability count, which was tried to the

bench.  The jury found him guilty of all charges, and the court found him guilty of having weapons while under disability.  At sentencing, the court found kidnapping and rape to be allied offenses and merged them, but did not merge aggravated burglary and rape.  He was sentenced to nine years for the rape, five years for aggravated burglary, to run concurrently.  He was also sentenced to three years for the firearms specification, to run consecutively to the nine-year term.  He was, in addition, sentenced to 36 months on having weapons while under disability, to run concurrently with the other counts.  His prison term totals 12 years.

{¶4}  Jack now appeals, raising two assignments of error for our review.  Under the first assignment of error, he argues his conviction was against the manifest weight of the evidence.  Under the second assignment of error, he claims the trial court erred in failing to merge the offenses of aggravated burglary and rape.

## Manifest Weight

{¶5}  The state presented ten witnesses, including the 18-year-old victim, C.C. She testified that she lived with her mother and two younger siblings, age 11 and 12, in a two-bedroom residence, the downstairs of a two-family home.  At the time of the incident, her mother was in the hospital for surgery.  C.C. was at home taking care of her siblings.  On the night of the incident, she slept in one of the bedrooms and her siblings slept in the other.  After putting her siblings to sleep and watching T.V., she went to bed around 1:00 or 2:00 a.m.

**{¶6}** C.C. testified that at some point in the early morning, she woke up to stretch herself, and was startled to find someone next to her with a gun. She felt someone grab her stomach, and felt a gun to the left side of her face. She could hear a little clicking noise made by the gun, which, from the early morning sunlight, appeared to be a gray or silver revolver. The intruder said to her "[b]e quiet or I'll shoot you." C.C. recognized the voice, because the man spoke with a lisp. She had met him through "Boo," who lives upstairs. The three of them had smoked marijuana on her front porch a week before the incident. She knew him as "Tavio" or "TO." She had also seen him on occasions at the bus stop on her way to work. He always wore a gray hoodie, and he wore one on this night too.

**{¶7}** After threatening to shoot her, he started to pull her pants down. She struggled with him and said "no, stop." He told her to be quiet, saying he knew her brother and sister were in the next room, and if they woke up, he would shoot them as well. She told him she knew who he was. Because he had difficulties getting an erection, he demanded she perform oral sex on him, which she refused. He finally penetrated her vagina and began to "hump on" her. She told him to stop because it was hurting. At one point, she told him she was pregnant, hoping to get him to stop. After he ejaculated inside her vagina, he told her to put the pillow over her head.

**{¶8}** C.C. waited until she heard the intruder leave by the front door — which made a squeaky sound when opened. She looked for her cell phone to call the police, but the cell phone was missing. She ran to the bedroom where her brother and sister

were sleeping to check on them before running upstairs to her neighbor living there. She knocked on the door, but there was no answer. She then ran to a friend and neighbor across the street, Elizabeth Law. She told her she was raped, crying hysterically. Law called the police. When the police arrived, C.C. told the officers what had occurred. An EMT ambulance then took her to MetroHealth Hospital, and a rape kit was performed by a sexual assault nurse.

{¶9} C.C. also testified that, a week later, she met with Detective Butler and provided him the nickname of the person she believed to be the intruder. A few days later, Officer Butler brought an array of six photos for her to make an identification. From the photo array, she identified Jack as the person who raped her. She also identified him in court.

{¶10} C.C. testified that on the night of the incident, she told her brother and sister to make sure the front door was locked, and did not check it herself. When she looked at the window a day after the incident, she noticed some fingerprints on the front window — and the window looked "as if someone was trying to push it up to take it out of its locked spot and to come in the house."

{¶11} C.C. testified she did not have a relationship with Jack, and she only spent time with him on one prior occasion. On cross-examination, she was asked by the defense counsel whether the sexual conduct was consensual. Defense counsel insinuated she may not have wanted her boyfriend to know about a sexual relationship between her and the defendant. She answered no.

**{¶12}** Elizabeth Law, C.C.'s neighbor across the street, testified that in the early morning of September 29, 2011, C.C. knocked on her door, crying and looking frantic, saying she was just raped. Law called 911 and reported that her neighbor just got raped. C.C. left in an ambulance, and Law's mother went over to take care of C.C.'s siblings.

**{¶13}** Shawn Prementine, a paramedic from Cleveland's Division of EMS, testified he responded to a call regarding a sexual assault. After a brief examination at the scene, his ambulance took C.C. to the MetroHealth Hospital.

**{¶14}** Kristina Jones, a sexual assault nurse examiner from MetroHealth Hospital, testified that she administered the sexual assault exam of C.C.

**{¶15}** Officer George Hardy of the Cleveland Police Department testified that he received a dispatch at about 6:30 a.m. on September 29, 2011, regarding a sexual assault. He looked around C.C.'s house for a forced entry. He observed that the front window was not locked, but he could not determine whether it had been left open, or if someone had forced their way in.

**{¶16}** C.C.'s 12-year-old sister testified that on the night of the incident, C.C. told her to make sure the door was locked before she went to bed, and she did. That night, she and her brother slept in her mother's bedroom. She was unaware of what had happened until police officers banged on her door and asked if she was okay. Because she was sure she had locked the front door, she pointed out the front window to the officers as to where the intruder might have come in. She testified that she has seen

Jack in the neighborhood. He had been introduced to her by her friend "Fonzo," but he had never been in her house.

{¶17} Officer John Riedthaler testified regarding the fingerprint evidence. The window area had a lot of fingerprints on it, and it appeared kids had been going in and out of the house through the window. Officer Riedthaler was only able to collect two fingerprints from the window area. He explained fingerprints in such an area are generally not usable for identification purposes, because, usually, when people push a window open they move their fingers and "it messes up the fingerprints." Officer Riedthaler did not collect fingerprints from the doorknob of the front door because, as he explained, doorknobs are touched by many people and are typically not useful as fingerprint evidence.

{¶18} Detective James Butler investigated this matter. He collected DNA samples from Jack and also prepared the photo array, from which C.C. identified Jack. Detective Butler testified that the fingerprints lifted off the window area did not match Jack's.

{¶19} Dr. Lindsey Nelson-Rausch, a forensic scientist from the Ohio Bureau of Criminal Identification and Investigation ("BCI"), testified that she examined the rape kit in this case, and found the presence of sperm in the vaginal samples from the kit. She testified that the sperm had the "tails" intact, indicating the sperm was deposited inside the vaginal cavity within 12 to 24 hours of when the samples were collected.

**{¶20}** Dr. Melissa Zielaskiewicz, a forensic scientist from the DNA section of Ohio BCI, performed the DNA testing in this case and determined that the vaginal swabs from C.C. resulted in a mixture consistent with contributions from C.C. and Jack.

**{¶21}** The defense claimed the sexual conduct was consensual. They did not, though, present any witnesses.

**{¶22}** On appeal, Jack claims his convictions are not supported by the manifest weight of the evidence. Unlike sufficiency of the evidence, manifest weight of the evidence raises a factual issue.

> "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."

*State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172,175, 485 N.E.2d 717 (1st Dist.1983).

**{¶23}** In evaluating a manifest weight claim, "the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. When examining witness credibility, "the choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact." *State v. Awan*, 22 Ohio St.3d 120, 123, 489 N.E.2d 277 (1986). A factfinder is free to believe all, some, or none of

the testimony of each witness appearing before it. *State v. Ellis*, 8th Dist. Cuyahoga No. 98538, 2013-Ohio-1184, ¶ 18.

{¶24} Regarding his manifest-weight claim, Jack primarily focuses on what he considers to be paltry police work in this case. He points out that the police never questioned a common acquaintance, "Boo," or otherwise investigated whether a prior relationship existed between Jack and C.C., which would have supported his claim of consensual sex.

{¶25} Despite his claim that the sexual conduct was consensual, Jack did not present any evidence at trial to show the existence of a relationship between him and C.C. More importantly, even if a relationship had existed between Jack and C.C., it does not in itself refute the rape claim. C.C. testified that, against her will, she was penetrated by C.C. at gun point in the early morning of September 29, 2011. This testimony constituted evidence of rape regardless of whether the two had a relationship. No doubt this case hinges heavily on C.C.'s credibility. Her testimony, however, was significantly bolstered by testimony from other witnesses that shows that she sought help and involved law enforcement immediately after the incident, and also underwent a sexual assault examination at the hospital.

{¶26} Jack, in addition, argues the manifest weight of the evidence does not support aggravated burglary because the two fingerprints collected from the window area did not match his. Although the police were unable to determine the point of entry by fingerprint evidence, the jury heard Officer Riedthaler explain that he was only able to lift

two fingerprints from the window area because fingerprints from such an area are difficult to collect. C.C. testified she did not give Jack permission to enter her home, and we are unwilling to substitute our own judgment in place of the factfinder's assessment of witness credibility.

{¶27} After reviewing the entire record, we conclude this is not one of the exceptional cases where the evidence weighs heavily against the convictions or where the trier of fact lost its way and created a manifest miscarriage of justice in convicting the defendant. The first assignment of error is without merit.

**Allied Offenses**

{¶28} At sentencing, the trial court found kidnapping to be an allied offense of rape and merged the two offenses. The court, however, did not merge aggravated burglary and rape, but instead imposed separate terms for these two offenses, albeit concurrently.[1]

{¶29} We review a trial court's determination as to whether offenses should merge under a de novo standard. *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, 983 N.E.2d 1245, ¶ 28.

{¶30} The merger statute, R.C. 2941.25, states:

---

[1] We note that where the trial court imposed concurrent terms for the separate offenses, as in this case, a defendant would still be prejudiced if the multiple offenses have required merger. *See State v. Underwood*, 124 Ohio St.3d 365, 2010-Ohio-1, 922 N.E.2d 923 ("even when the sentences are to be served concurrently, a defendant is prejudiced by having more convictions than are authorized by law").

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶31} Ohio courts have long used a two-prong test to determine whether multiple offenses should be considered allied offenses and merged. In *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061, the Supreme Court of Ohio instructed that, in applying the two-prong test, the particular defendant's conduct must be considered. In the most recent allied offenses case from the Supreme Court of Ohio, *State v. Washington*, Slip Opinion No. 2013-Ohio-4982, the court reiterated the two-prong test as follows:

> * * * The first prong looks to the import of the offenses and requires a comparison of their elements. If the elements "correspond to such a degree that the commission of one offense will result in the commission of the other," the offenses share a similar import. Only then can the merger analysis proceed to the second prong. The second prong looks to the defendant's conduct and requires a determination whether the offenses were committed separately or with a separate animus. If the offenses were committed by the same conduct and with a single animus, the offenses merge.

(Citations omitted.)  *Id*. at ¶ 13.

**{¶32}** Stated differently, multiple offenses are "allied" "if the defendant's conduct is such that a single act could lead to the commission of separately defined offenses, but those separate offenses were committed with a state of mind to commit only one act." *State v. Thompson*, 8th Dist. Cuyahoga No. 99628, 2014-Ohio-202, ¶ 18.

### Whether Aggravated Burglary and Rape Are Allied Offenses

**{¶33}** Under the second assignment of error, Jack contends that his aggravated burglary and rape offenses are also allied and should have been merged by the trial court.

**{¶34}** Jack was found guilty of rape as defined in R.C. 2907.02(A)(2), which provides that "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." He was found guilty of aggravated burglary as defined in R.C. 2911.11(A)(1), which provides that "[n]o person, by force, stealth or deception shall trespass into an occupied structure * * * when another person * * * is present, with purpose to commit in the structure * * * any criminal offense, if * * * [t]he offender inflicts, or attempts or threatens to inflict physical harm on another."

**{¶35}** Before *Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061, it was widely acknowledged that aggravated burglary defined in R.C. 2911.11(A)(1) is not allied with an offense of violence, such as rape, that occurs after the defendant has entered the premises. *State v. Moss*, 10th Dist. Franklin No. 99AP-30, 1999 Ohio App. LEXIS 6497 (Dec. 28, 1999) (aggravated burglary and attempted rape not allied); *State v. Lamberson*, 12th Dist. Madison No. CA2000-04-012, 2001 Ohio App. LEXIS 1255 (Mar.

19, 2001) (aggravated burglary and rape not allied offenses). *See also State v. Grinder*, 8th Dist. Cuyahoga No. 80617, 2002-Ohio-3792 (aggravated burglary and rape not allied offenses); *State v. Butts*, 9th Dist. Summit No. 24517, 2009-Ohio-6430 (aggravated burglary and rape not allied offenses); *State v. Taylor*, 12th Dist. Madison No. CA2007-12-037, 2009-Ohio-924 (aggravated burglary and rape not allied offenses).

**{¶36}** *Johnson* does not change the analysis here. Under the first prong, Jack's conduct — of trespassing into the victim's home with purpose to commit a crime (resulting in his inflicting or threatening to inflict harm) and the rape of the victim — was not a single act leading to the commission of two separately defined offenses. Rather, Jack engaged in two separate, distinct acts, regardless of whether the only purpose behind his conduct was to compel the victim to submit to sexual conduct with him. Therefore, the allied offenses inquiry ends here, and we do not proceed to the second prong.

**{¶37}** The second assignment of error is without merit.

**{¶38}** Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
TIM McCORMACK, JUDGE

MELODY J. STEWART, P.J., and
MARY J. BOYLE, A.J., CONCUR