[Cite as *State v. Portman*, 2014-Ohio-4343.]

IN THE COURT OF APPEALS FOR CLARK COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| Plaintiff-Appellee | : | C.A. CASE NO.   2013-CA-68 |
| v. | : | T.C. NO.   2012-CR-639 |
| DUANE PORTMAN | : | (Criminal appeal from Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . .

**O P I N I O N**

Rendered on the ____26th____ day of ____September____, 2014.

. . . . . . . . . .

RYAN A SAUNDERS, Atty. Reg. No. 0091678, Clark County Prosecutor's Office, 50 East Columbia Street, Suite 449, Springfield, Ohio 45502
          Attorney for Plaintiff-Appellee

DAVID M. MORRISON, Atty. Reg. No. 0087487, Morrison Law Offices, LLC, Post Office Box 750383, Dayton, Ohio 45475
          Attorney for Defendant-Appellant

. . . . . . . . . .

FROELICH, P.J.

     **{¶ 1}** Following the denial of his motion to suppress, Duane Portman was

found guilty by a jury in the Clark County Court of Common Pleas of one count of aggravated robbery, one count of kidnapping, and six counts of rape, each with a firearm specification. At sentencing, the trial court refused to merge any of the counts for sentencing, finding that the offenses were all "separate offenses." Portman was sentenced to an aggregate prison term of 14 years and was designated as a Tier III sex offender; the court also imposed a mandatory five-year term of post-release control. Portman appeals from the trial court's judgment.

{¶ 2} For the following reasons, the judgment of the trial court will be affirmed.

{¶ 3} On September 2, 2012, the complainant, an escort, was robbed of her identification, cell phone, and other possessions and was repeatedly raped in the basement of a clothing shop in Springfield, which was owned by Portman. The complainant later identified Portman as the perpetrator of the crimes. During the rapes, Portman threatened the complainant with a gun. The complainant testified that Portman repeatedly inserted his penis into her vagina and into her mouth; he also inserted his fist into her vagina, hitting her and causing her pain and bleeding. He also forced her to suck on the gun and placed the gun inside her vagina.

{¶ 4} After the rapes, and after attempting to convince Portman that she needed to use the restroom on the main floor of the store, the complainant got into a scuffle with Portman while he was holding the gun. The complainant managed to grab the gun from Portman. While running up the steps, she fired the gun backward toward Portman. She did not see whether she had shot him, but she assumed that she had hit him because she saw his head turn and he stopped chasing her. She ran outside to her car, where a friend was

waiting for her, and drove away.

{¶ 5}    Later that night, Portman drove himself to a hospital in Springfield, and the complainant went to a hospital in Dayton.   Portman had a gunshot wound to his face.   Law enforcement officers were called to both hospitals.   Portman could not or would not tell the police what had happened to him, and Springfield police officers initially suspected that Portman may have been the complainant of a robbery or other crime at his business; they began to investigate the matter as such.   Portman's girlfriend, Regina Pedrotti, arrived at the hospital and cooperated with the officers, giving them consent to search the vehicle in which Portman had driven to the hospital and the business; they found blood at both locations and a handgun in plain sight at the business.   During the course of their investigation, the Springfield police officers learned that a woman (the complainant) at a Dayton hospital claimed to have been raped at a business in Springfield and to have shot the perpetrator. They subsequently obtained search warrants to conduct more thorough searches of Portman's vehicle and business.

{¶ 6}    On September 17, 2012, Portman was indicted for aggravated robbery, kidnapping, and six counts of rape, each with a firearm specification.   He filed a motion to suppress evidence, which was overruled.   The case was tried to a jury in June 2013, and Portman was found guilty on all counts and the firearm specifications.   He was sentenced to three years for aggravated robbery and to eleven years each on the counts of kidnapping and rape.   The court ordered that these sentences run concurrently, but consecutively to the three-year sentence on the firearm specification, for an aggregate sentence of 14 years.

{¶ 7}    Portman appeals, raising two assignments of error.   Portman's first

assignment of error states:

**The trial court erred by overruling the motions to suppress evidence seized from the vehicle and business.**

{¶ 8} Portman contends that the trial court erred in concluding that there had been valid consent by Pedrotti to the searches of his car and business. He asserts that the State presented no evidence that Pedrotti had actual authority to consent to a search of Portman's vehicle or business or that the officers reasonably believed that she had authority to consent. He claims that, without the evidence obtained from the searches to which Pedrotti consented (blood and a handgun observed inside the store), there would have been insufficient evidence to support the issuance of a search warrant; as such, he asserts that evidence obtained in the subsequent searches should have been suppressed.

{¶ 9} When ruling on a motion to suppress, "the trial court assumes the role of trier of facts and is in the best position to resolve questions of fact and evaluate the credibility of witnesses." *State v. Hopfer*, 112 Ohio App.3d 521, 548, 679 N.E.2d 321 (2d Dist.1996), quoting *State v. Venham*, 96 Ohio App.3d 649, 653, 645 N.E.2d 831 (4th Dist.1994). In reviewing the trial court's decision on a motion to suppress, an appellate court must accept the trial court's findings of fact as true, if they are supported by competent, credible evidence. *State v. Dudley*, 2d Dist. Montgomery No. 24904, 2012-Ohio-960, ¶ 6. The appellate court must then determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard. *Id*.

{¶ 10} The Fourth Amendment to the United States Constitution and Section 14, Article I of the Ohio Constitution protect individuals from unreasonable searches and

seizures. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *State v. Pressley*, 2d Dist. Montgomery No. 24852, 2012-Ohio-4083, ¶ 18. "Under applicable legal standards, the State has the burden of showing the validity of a warrantless search, because warrantless searches are 'per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well delineated exceptions.'" *State v. Hilton*, 2d Dist. Champaign No. 08-CA-18, 2009-Ohio-5744, ¶ 21-22, citing *Xenia v. Wallace*, 37 Ohio St.3d 216, 218, 524 N.E.2d 889 (1988).

{¶ 11} One of the specifically established exceptions to the warrant requirement is a search that is conducted with consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *State v. Posey*, 40 Ohio St.3d 420, 427, 534 N.E.2d 61 (1988). Consent to search can be "obtained, either from the individual whose property is searched, or from a third party who possesses common authority over the premises." *Illinois v. Rodriguez*, 497 U.S. 177, 181, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990). "The authority which justifies third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *State v. Gordnoshnka*, 8th Dist. Cuyahoga No. 86319, 2006-Ohio-563, ¶ 11, citing *United States v. Matlock*, 415 U.S. 164, 172, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974).

{¶ 12} The State is required to establish, by clear and convincing evidence, that

consent to the search was freely and voluntarily given by one with authority to do so. *Posey* at 427; *State v. Connors-Camp*, 2d Dist. Montgomery No. 20850, 2006-Ohio-409, ¶ 29.

{¶ 13}    It is not necessary that the consenting third party have actual authority over the premises. *United States v. Ayoub*, 498 F.3d 532, 537 (6th Cir.2007); *State v. Corbin*, 194 Ohio App.3d 720, 2011-Ohio-3491, 957 N.E.2d 849, ¶ 28 (6th Dist.).   Even if an officer erroneously believes that a third-party is authorized to give consent, using an objective standard, third-party consent is valid if an officer looking at the then-available facts could reasonably conclude that the third-party had apparent authority to consent. *Rodriguez* at 186; *Corbin* at ¶ 28.   An officer's belief is not reasonable if the surrounding circumstances would lead a reasonable person to doubt the authority of the third party.   *Rodriguez* at 188; *Corbin* at ¶ 28.

{¶ 14}    Three members of the Springfield Police Department testified at the suppression hearing.   Sergeant Hopper, Detective DeWine, and Officer Harold testified that, on September 2, 2012, they were dispatched to the Springfield Regional Medical Center because an individual (Portman) had arrived there with a gunshot wound to the head. Portman had provided little or no information about the circumstances surrounding his shooting, and the officers thought Portman may have been the victim of a robbery.

{¶ 15}    Officer Harold spoke with Portman and, upon discovering that Portman had driven himself to the hospital, Harold instructed Officer Wendling to stand outside by the vehicle, a Dodge Durango.   While Wendling was so positioned, a woman who identified herself as "Regina" (Pedrotti) approached Wendling, identified herself as Portman's wife, and talked with him about Portman's vehicle.

{¶ 16}   Sgt. Hopper testified that both Portman and Pedrotti had referred to Pedrotti as Portman's "wife."   Moreover, when Portman asked hospital personnel whether his wife had come to the hospital, Pedrotti was permitted into the room.

{¶ 17}   Inside the hospital, Pedrotti informed Sgt. Hopper that Portman's Dodge Durango was parked outside the hospital and that she and Portman owned a business at 1605 Fulton Avenue, a clothing shop, at which Portman sometimes worked late at night.   Pedrotti referred to these assets as "their" Durango and "their" business.   She also told Hopper that she lived with Portman.

{¶ 18}   In the hospital parking lot, in Pedrotti's presence, the officers opened and examined the Durango.   The officers observed "a little bit of blood" inside the vehicle, but nothing that they considered "major evidence."

{¶ 19}   In the meantime, Officer Jennifer Scott had been dispatched by Hopper to the business at 1605 Fulton to look for any sign of a robbery or other crime related to Portman's shooting.   While Sgt. Hopper remained at the hospital with Pedrotti, Scott reported to him that the business was "secure" but that there was blood on the glass entry door.   Hopper asked Pedrotti for permission to "check" the business to "make sure there was nobody else injured."   Pedrotti consented, giving Hopper the keys to the business; Hopper departed for the business, but Pedrotti did not accompany him.

{¶ 20}   When Hopper arrived at 1605 Fulton, he opened the door with Pedrotti's key.   Inside, he and other officers observed a trail of blood through the main level of the store, in the bathroom, down a stairwell, through another sales area, through a storage room, and into a room with a couch and television.   They also observed a handgun in the

basement. At that point, Hopper called another sergeant about obtaining a search warrant. No other injured parties were found.

{¶ 21} While the officers were working on obtaining a search warrant, they learned that a woman who was being treated at a hospital in Dayton claimed to have been sexually assaulted in Springfield and to have shot the perpetrator in the face.

{¶ 22} On cross-examination, Hopper acknowledged that some of the paperwork he filled out the day of the search had described Pedrotti as Portman's girlfriend or live-in girlfriend, rather than his wife.

{¶ 23} Portman did not present any evidence at the suppression hearing.

{¶ 24} The trial court credited the officers' testimony that Portman and Pedrotti had indicated that they were married and that Pedrotti had indicated joint ownership of the Durango and the business by referring to them using a possessive pronoun and producing the keys to each. The court concluded that the officers had obtained voluntary consent to search the car and business from Pedrotti, the woman they reasonably believed to be Portman's wife and who had keys to both the vehicle and the business. The court implicitly concluded that the officers reasonably believed that Pedrotti was authorized to give consent to these searches. The court further concluded that exigent circumstances justified the officers' entry into the business establishment. (Exigent circumstances is another exception to the search warrant requirement, where probable cause exists to believe that a crime has been committed and the circumstances suggest a true emergency or danger exists. *State v. Burchett*, 2d Dist. Montgomery No. 20166, 2004-Ohio-3095, ¶ 17, citing *State v. Cheadle*, 2d Dist. Miami No. 00CA03, 2000 WL 966167 (July 14, 2000).)

{¶ 25}    Although there is a discrepancy between Hopper's hearing testimony and his report prepared the day of the search as to whether he believed Pedrotti was Portman's wife or his girlfriend, two other officers testified that they had believed the couple to be married; there is no dispute that the couple lived together.  Moreover, Pedrotti's statements to the officers asserted joint ownership of the vehicle and the business.  This assertion was buttressed by Pedrotti's possession of keys to the vehicle and the business.  Although the possession of keys, in itself, is not necessarily determinative of a right to control and give consent, it is one factor from which officers may reasonably infer possession and shared control.  Here, that inference was not contradicted by any other evidence or observations which might have reasonably caused the officers to question Pedrotti's authority to give consent.  See *Rodriguez,* 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (holding that officers had a reasonable belief that the woman who referred to the residence as "our" apartment and produced a key which allowed the police to enter the apartment, had authority to consent to a search); *State v. Scott*, 61 Ohio St.2d 155, 162-63, 400 N.E.2d 375, 381 (1980) (holding that wife's rights of common access, control and use of an automobile permitted her to authorize a search thereof).

{¶ 26}    Because the trial court reasonably concluded that Pedrotti had consented to the searches of the vehicle and the business and that the officers reasonably believed that she had the authority to give such consent, the officers' initial searches without a warrant were permissible.  Portman's constitutional rights were not violated by the searches conducted pursuant to Pedrotti's consent, and he was not entitled to the suppression of the evidence obtained as a result of those searches.

**{¶ 27}** Portman raises additional arguments related to whether exigent circumstances existed at the business before the initial search (due to the blood on the door) and whether there was probable cause to support the issuance of the search warrant if the evidence obtained in the initial serach were excluded. Having concluded that the officers reasonably relied on Pedrotti's authority to consent to the initial searches, we need not address these arguments.

**{¶ 28}** The first assignment of error is overruled.

**{¶ 29}** Portman's second assignment of error states:

**The trial court committed plain error by failing to merge the count for kidnapping with the rape counts for the purpose of sentencing.**

Portman did not ask the trial court to merge his rape and kidnapping convictions or object to its failure to do so. Accordingly, he waived all but plain error. We have held, however, that the failure to merge allied offenses of similar import at sentencing constitutes plain error, even when concurrent sentences are imposed. *State v. McGhee*, 2d Dist. Montgomery No. 23226, 2010-Ohio-977, ¶ 87.

**{¶ 30}** R.C. 2941.25, Ohio's allied offense statute, provides that:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of

the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

**{¶ 31}** "When determining whether two offenses are allied offenses of similar import subject to merger under R.C. 2941.25, the conduct of the accused must be considered." *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061, syllabus. The Ohio Supreme Court explained:

> * * * [T]he question is whether it is possible to commit one offense and commit the other with the same conduct, not whether it is possible to commit one without committing the other. * * * If the offenses correspond to such a degree that the conduct of the defendant constituting commission of one offense constitutes commission of the other, then the offenses are of similar import.
>
> If the multiple offenses can be committed by the same conduct, then the court must determine whether the offenses were committed by the same conduct, i.e., "a single act, committed with a single state of mind." * * *
>
> If the answer to both questions is yes, then the offenses are allied offenses of similar import and will be merged.
>
> Conversely, if the court determines that the commission of one offense will never result in the commission of the other, or if the offenses are committed separately, or if the defendant has separate animus for each offense, then, according to R.C. 2941.25(B), the offenses will not

merge.(Citations and quotations omitted.)

*Johnson* at ¶ 48-51.

**{¶ 32}**    All rapes inherently involve a restraint on the liberty of another, and where the act of rape is the sole unlawful exercise of restraint on the physical liberty of another person, the law is clear that any accompanying kidnapping charge should merge with the rape charge. *State v. Logan*, 60 Ohio St.2d 126, 397 N.E.2d 1345 (1979).   A separate animus for kidnapping exists where (1) "the restraint is prolonged, the confinement is secretive, or the movement is substantial so as to demonstrate a significance independent of the other offense," or (2) "the asportation or restraint of the complainant subjects the complainant to a substantial increase in risk of harm separate and apart from that involved in the underlying crime." *Logan* at syllabus; *see also State v. Rucker*, 2d Dist. Montgomery No. 24340, 2012-Ohio-4860, ¶ 52.   Although focused on the animus aspect of the allied offense analysis, these factors are also reasonable considerations for determining whether the defendant committed kidnapping as separate conduct from other offenses. *See State v. Lovato*, 2d Dist. Montgomery No. 25683, 2014-Ohio-2311, ¶ 13, citing *State v. Ware*, 63 Ohio St.2d 84, 406 N.E.2d 1112 (1980).

**{¶ 33}**    According to the complainant, she was working as an escort, which meant that she was available for hire to men for companionship; her website stated that she was available for role play, fetishes, and massage.   She stated that sex was not included in her standard rate and that she did not generally engage in sex as part of her escort work.

**{¶ 34}**    The complainant received a call on her work phone from "Mike" (Portman) at approximately 11:00 p.m. on September 1, 2012.   This was the complainant's first

contact with Portman. After several calls and texts, they set up a meeting at Portman's business, Labelz4Less clothing store. The complainant tried to obtain references from Portman so that she could make sure it was "safe" to see him, but he was unable to provide references. Portman texted the complainant his business address and told her not to bring anyone with her. They negotiated a price ahead of time, but did not discuss what services were expected or would be provided for that price.

{¶ 35} The complainant arrived at Portman's place of business around 1:00 a.m. on September 12, 2012. Despite Portman's admonition that the complainant should not bring anyone with her, she did bring a male acquaintance for her safety, as was her common practice; he waited in the car. Based on Portman's comments and behavior, the complainant ascertained that he was agitated that the complainant had brought someone with her.

{¶ 36} Once inside the store, Portman locked the front door and led the complainant through the store and into the basement, with his hand on her back. The complainant asked if they could remain on the main floor, and Portman refused to do so, saying that there was furniture in the basement. When they reached the basement, Portman stated to the complainant: "Now, do I look like a motherf***er[1] that would pay for p***y?" and laughed. Portman's comments and laughter made the complainant increasingly uncomfortable with the situation. She informed Portman that she wanted to leave, explaining that she was tired because of a sick child and offering to come back another time

---

[1] Because our opinions are widely available online, we have chosen to insert asterisks into certain offensive words that appear in the transcript of this case and in other cases.

or to set him up with a friend of hers who lived down the street. Portman continued to laugh intermittently, and he said he was getting frustrated with the complainant.

{¶ 37} According to the complainant, she told Portman that she wanted to leave within five minutes of arriving at the store. (Her total time in the store was approximately 45 minutes.) When she stood up to go, Portman put a gun to her head, which she believed he had pulled from the couch cushions. Portman continued to berate her about who was in the car and rubbed the gun on the complainant's face. He then proceeded to rape her several times. After the rapes, Portman refused to allow the complainant to go to the main floor of the store to use the restroom. When the complainant attempted to leave against Portman's wishes, Portman struggled with her on the stairs. She escaped only when she wrestled the gun from Portman and fired it over her shoulder, shooting him in the face.

{¶ 38} Portman asserts that the trial court erred in failing to merge the count of kidnapping with the counts of rape. He claims that the restraint of the complainant was incidental to the rapes and that no separate conduct or animus existed.

{¶ 39} In cases considering whether rapes and kidnappings are allied offenses of similar import, kidnapping has been found to be separate from rape where the complainant was held for a substantial period of time apart from a rape, where the complainant was transported to another location, or where the circumstances surrounding the complainant's detention substantially increased the risk of harm to her. *See, e.g, State v. Greathouse*, 2d Dist. Montgomery No. 21536, 2007-Ohio-2136 (involving prolonged detention of the complainant, forcing the complainant to drive around for some time in an automobile before the rape while threatening to crash and burn the car with the complainant inside, and

threatening to shoot and kill the complainant); *State v. Smith,* 7th Dist. Mahoning No. 12 MA 168, 2014-Ohio-1398 (where the complainant testified that she was held captive for six hours); *State v. Freeman*, 7th Dist. Mahoning 12 MA 112, 2014-Ohio-1013 (where defendant surprised his complainant from behind, held an object to her back, forced her into a car, restrained her within the car for over three hours, and transported her across county lines against her will and in fear for her life, before raping her hours later)*; State v. Rivera*, 10th Dist. Franklin No. 12AP-691, 2014-Ohio-842 (where restraint was prolonged and secretive and there was substantial movement of the complainant, which subjected her to a substantial increase in the risk of harm, separate and apart from the rape).

{¶ 40}    On the other hand, where the restraint is incidental to the rape, the offenses of kidnapping and rape have been found to be allied offenses of similar import.  *See, e.g., State v. Jack*, 8th Dist. Cuyahoga No. 99499, 2014-Ohio-380 (where defendant got into bed with sleeping complainant, grabbed her, told her to be quiet and threatened to shoot her, before raping her); *Logan*, 60 Ohio St.2d 126, 397 N.E.2d 1345 (victim was forced into an alley and down a flight of stairs prior to rape).

{¶ 41}    We recently addressed another case in which the defendant claimed that kidnappings were incidental to the rapes he committed. *State v. Lovato*, 2d Dist. Montgomery No. 25683, 2014-Ohio-2311.  *Lovato* involved two separate incidents, only one of which we found to present a close question on the issue of merger.  In that incident, after some interaction at a store and a nearby bus stop, the defendant punched the complainant, causing her to lose consciousness.  He then dragged her by her coat hood into a garage in a nearby alley.  When the complainant regained consciousness and attempted to

flee, the defendant choked her until she passed out again, dragged her back into the garage, and removed some of her clothes. He then raped her repeatedly. We observed: "[T]he record does not demonstrate that [the complainant] was moved a significant distance or that she was held for a significant period of time other than for the purpose of raping her." Nonetheless, we concluded that the kidnapping was not merely incidental to the rapes. "With [the complainant's] escape and recapture, Lovato engaged in a significant course of conduct to subdue [the complainant] prior to sexually assaulting her. This conduct greatly increased the risk of harm to [her], and it took on a significance distinct from the rapes themselves, which occurred after [she] was recaptured." *Id*. at ¶ 19. We concluded that the trial court did not err in failing to merge the kidnapping with the rape.

**{¶ 42}** We cannot say that the trial court erred in concluding that the facts of Portman's case did not compel the merger of the rapes and kidnapping as allied offenses of similar import. Portman led the complainant through the store to a lounge-type area in the basement, which could not be seen from the parking lot and was more isolated than other parts of the store. Portman put a gun to her head when she expressed her desire to leave, asking her about the friend waiting in her car and preventing her from leaving. After the rapes, he again attempted to prevent her from leaving the basement, through physical restraint and brandishing the gun. Although the additional aspects of time, distance, and danger that related to the kidnapping in this case, as separate from the rape, are not as significant as those found in some of the other cases we have discussed, Portman did threaten the victim with a gun and prevent her from leaving, before and after the rapes. The trial court reasonably concluded that "the offenses are all separate offenses and * * * would

not merge for purposes of sentencing."

{¶ 43}    The second assignment of error is overruled.

{¶ 44}    The judgment of the trial court will be affirmed.

. . . . . . . . . .

FAIN, J. and DONOVAN, J., concur.


Copies mailed to:

Ryan A. Saunders
David M. Morrison
Hon. Douglas M. Rastatter