[Cite as *State v. Walter*, 2020-Ohio-6772.]

COURT OF APPEALS
GUERNSEY COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | |
| | : | Hon. John W. Wise, P.J. |
| Plaintiff-Appellee | : | Hon. Patricia A. Delaney, J. |
| | : | Hon. Earle E. Wise, Jr., J. |
| -vs- | : | |
| | : | Case No. 2020CA000006 |
| | : | |
| KENNETH RUSSELL WALTER | : | |
| | : | |
| | : | |
| Defendant-Appellant | : | O P I N I O N |

CHARACTER OF PROCEEDING:      Appeal from the Guernsey County Court of Common Pleas, Case No. 19CR000113

JUDGMENT:      AFFIRMED

DATE OF JUDGMENT ENTRY:      December 17, 2020

APPEARANCES:

For Plaintiff-Appellee:

JOEL BLUE
GUERNSEY COUNTY PROSECUTOR

JASON R. FARLEY
627 Wheeling Ave.
Cambridge, OH 43725

For Defendant-Appellant:

FREDERICK A. SEALOVER
45 N. Fourth St.
P.O. Box 2910
Zanesville, OH 43702-2910

*Delaney, J.*

{¶1}   Defendant-Appellant Kenneth Russell Walter appeals the February 4, 2020 judgment entry of conviction and sentence by the Guernsey County Court of Common Pleas. Specifically, he argues the trial court erred when it denied his motion to suppress.

**FACTS AND PROCEDURAL HISTORY**

{¶2}   On April 1, 2019, Defendant-Appellant Kenneth Russell Walter was indicted by the Guernsey County Grand Jury on one count of Having Weapons While Under Disability in violation of R.C. 2923.13(B), a felony of the third degree. Walter entered a plea of not guilty.

{¶3}   Walter filed a motion to suppress the evidence obtained by the Cambridge Police Department after a warrantless entry into his home. The State responded to the motion. The trial court held a hearing on the motion on July 29, 2019. The following facts were adduced at the hearing.

{¶4}   On February 6, 2019, the Guernsey County Sheriff's Office dispatch received a 911 hang-up call and transferred the call to the City of Cambridge Police Department. The dispatch called the number back and a man told the dispatcher that his four-year-old son made the phone call and law enforcement was not needed. Sergeant Zachary Wolfe of the Cambridge Police Department was dispatched to the address that made the 911 hang-up call because it was the policy of the Cambridge Police Department to investigate 911 calls until they could prove there was not an emergency at hand. (T. 8).

{¶5}   Sgt. Wolfe arrived at the residence with other officers at approximately 1:00 a.m. The residence was mostly dark. The officers used flashlights to look in the windows

of the residence to see if anyone was in the home needing assistance. (T. 9). They knocked on the windows and back door of the residence. (T 16). Dispatch called the number back several times and there was no response. (T. 9). The officers came back to the front of the residence and Sgt. Wolfe started "pounding on the door trying to get someone to respond." (T. 9). Sgt. Wolfe described the front door as "fairly disheveled. It appeared it had been kicked in once before. The door jamb was like patched together, and the door itself was patched together. It was in poor shape." (T. 10). While Sgt. Wolfe was pounding on the front door, it came open. He announced the officers' presence and called out to the residents inside.

{¶6}   Sgt. Wolfe first made contact with A.C.W., Walter's wife. A.C.W. told Sgt. Wolfe that it was her fault that the call was made because she was drunk and she was arguing with Walter. A.C.W. told the officers that only she and a friend, N.W., were at the residence. She said Walter had left the residence before the arrival of the police. (T. 10).

{¶7}   Sgt. Wolfe asked A.C.W. to step outside and called for N.W. to come out of the residence. Sgt. Wolfe next saw Walter get up off the couch. He was asked to leave the residence and was searched for weapons. (T. 11). N.W. came out of the residence and he was searched for weapons. (T. 11). Sgt. Wolfe explained to Walter that the police were there based on the 911 hang-up call and to ensure the occupants safety with a protective sweep of the home.

{¶8}   With Walter's consent, the officers conducted a protective sweep of the residence to ensure no one was injured in the residence. (T. 13). The officers did not find anyone else in the residence, but they observed a firearm case and ammunition on the steps to the basement in plain view. After the protective sweep, Sgt. Wolfe said that

Patrolman Eubanks spoke with Walter who consented to a search of the residence. (T. 15).

{¶9}   A.C.W. testified at the hearing the residence belonged to her and Walter. On February 6, 2020, she heard continuous pounding on the front door for at least 14 minutes, but she did not answer the door. (T. 21). She made herself visible to the police officers after the door was opened. (T. 21). She stated that before the officers arrived at the home, the front door had a functioning lock and was locked that morning. (T. 23). She stated that the family did not use the front door for ingress and egress, they used the back door. (T. 25). The front door had some damage to it prior to February 6, 2019. (T. 25). Photographs of the front door taken by A.C.W. a week after the incident were presented as exhibits at trial.

{¶10} N.W. testified at the hearing that on February 6, 2019, only he, A.C.W., and Walter were in the residence. (T. 27). N.W. was upstairs when he heard pounding on the door for 10 to 15 minutes. (T. 27). He stated that before law enforcement came to the home, the front door was screwed shut and could not be opened. (T. 28).

**Body Cam Video**

{¶11}  Wolfe was wearing a body camera on February 6, 2019. The video of the body cam recording was shown at hearing.

{¶12} At time marker 2:03, the officers arrived at Walter's residence, a brick house. There was a porch light on in the front of the house. The front door was made of wood and had multiple small glass windows at the top allowing the officers to see into the house. The door appeared to be old and the paint was peeling. An officer knocked on the front door at time marker 2:03, approximately nine times. The officer waited about 20 to

30 seconds, then knocked again approximately nine times. The officer again waited about 20 to 30 seconds, then knocked on the front door again about nine times. No one answered the front door.

{¶13} Sgt. Wolfe walked along the side of the house to the back door. There was a light on above the back door. At time marker 2:04, Sgt. Wolfe knocked on the back door about eight times. He waited one minute then knocked more loudly on the back door about 15 times. He walked to the side of the house and looked in a window, but the shade was down. Another officer went to the back door and at time marker 2:07, knocked approximately ten times.

{¶14} Sgt. Wolfe went to the front door and at time marker, 2:08, knocked loudly on the door. He asked dispatch whether the male on the 911 hang-up call seemed to be in distress.

{¶15} At time marker 2:09, Sgt. Wolfe looked in the side windows. He opened one window, which was unlocked and covered with plastic wrap insulation and a closed blind. Through the open window he yelled, "Cambridge Police." He asked the unknown occupants to come down and talk to them to make sure they were okay. At time marker 2:11, he knocked on the window for about two minutes.

{¶16} The dispatcher is heard on the body cam recording saying she listened to the playback of the call and it was not a child but an adult who made the call. The caller said, "Cambridge" and then hung up. The dispatcher told Sgt. Wolfe that the call was too short to hear if the caller was under any kind of stress.

{¶17} At time marker 2:11, an officer knocked on a window for approximately 30 seconds. The officer knocked on the window again. At time marker 2:12, the officer went

to the back door and knocked for approximately one minute. The officer announced at the back door that they were the Cambridge Police and to come to the door to make sure everyone was alright.

{¶18} At time marker 2:14, Sgt. Wolfe knocked on the front door and called the occupants to come to the door. He knocked at 2:15 and again at 2:16. At time marker 2:16, Sgt. Wolfe knocked harder on the door while calling to the occupants to come to the door. At this point, the door popped open. The officers stayed outside the door and yelled, "Cambridge Police Department with a canine." The officers did not enter the home.

{¶19} A.C.W. came out of the house through the front door. She stated that only N.W. was in the home. Her child was there but he left earlier. She admitted that she had been drinking. N.W. and then Walter came out of the house. Walter and Sgt. Wolfe commented there was a new front door sitting in the hallway.

{¶20} Sgt. Wolfe conducted a weapons search of Walter and asked if the officers could conduct a protective sweep of the residence. Walters consented. Sgt. Wolfe and another officer conducted a protective sweep and the home appeared to be in the middle of a remodel. While the officers were conducting the protective sweep, ammunition can be seen on the floor of the house.

{¶21} During the protective sweep, the video recording ended because the body cam lost its charge. Sgt. Wolfe testified that after the protective sweep, Patrolman Eubanks spoke to Walter who gave consent to search the house.

**Judgment**

{¶22} On August 16, 2019, the trial court issued its judgment entry denying the motion to suppress. The trial court determined the issue before it was whether officers

had reasonable grounds to believe that an emergency existed because of the 911 hang-up call. The trial court concluded that after examining the totality of the circumstances, the officer's warrantless entry into the home was reasonable pursuant to the exigent circumstances exception to the Fourth Amendment.

{¶23} The trial court held a change of plea and sentencing hearing on February 4, 2020. Walter entered a no contest plea to the charge of Having a Weapon Under Disability. Walter also entered a plea of no contest to charges from an unrelated indictment. The trial court accepted Walter's plea and found him guilty of the charges. On the charge of Having Weapons Under Disability, the trial court sentenced Walter to 24 months. On the sum of the charges, Walter was sentenced to an aggregate prison term of 36 months.

{¶24} Walter now appeals the August 16, 2019 judgment entry denying his motion to suppress.

## ASSIGNMENTS OF ERROR

{¶25} Walter raises one Assignment of Error:

{¶26} "THE TRIAL COURT ERRED BY DENYING THE DEFENDANT-APPELLANT'S MOTION TO SUPPRESS EVIDENCE AS THE STATE FAILED TO PROVE THE EXISTENCE OF EXIGENT CIRCUMSTANCES NECESSARY TO JUSTIFY A WARRANTLESS HOME ENTRY."

## ANALYSIS

{¶27} Walter contends in his sole Assignment of Error that the trial court erred when it denied his motion to suppress evidence seized after the warrantless search to his home.

**Standard of Review**

{¶28} Appellate review of a trial court's decision to deny a motion to suppress involves a mixed question of law and fact. *State v. Long*, 127 Ohio App.3d 328, 332, 713 N.E.2d 1 (4th Dist.1998). During a suppression hearing, the trial court assumes the role of trier of fact and, as such, is in the best position to resolve questions of fact and to evaluate witness credibility. *State v. Brooks*, 75 Ohio St.3d 148, 154, 661 N.E.2d 1030 (1996). A reviewing court is bound to accept the trial court's findings of fact if they are supported by competent, credible evidence. *State v. Medcalf*, 111 Ohio App.3d 142, 145, 675 N.E.2d 1268 (4th Dist.1996). Accepting these facts as true, the appellate court must independently determine as a matter of law, without deference to the trial court's conclusion, whether the trial court's decision meets the applicable legal standard. *State v. Williams*, 86 Ohio App.3d 37, 42, 619 N.E.2d 1141 (4th Dist.1993), overruled on other grounds.

{¶29} There are three methods of challenging a trial court's ruling on a motion to suppress on appeal. First, an appellant may challenge the trial court's finding of fact. In reviewing a challenge of this nature, an appellate court must determine whether the trial court's findings of fact are against the manifest weight of the evidence. *See State v. Fanning*, 1 Ohio St.3d 19, 437 N.E.2d 583 (1982); *State v. Klein*, 73 Ohio App.3d 486, 597 N.E.2d 1141 (4th Dist.1991). Second, an appellant may argue the trial court failed to apply the appropriate test or correct law to the findings of fact. In that case, an appellate court can reverse the trial court for committing an error of law. *See Williams, supra*. Finally, an appellant may argue the trial court has incorrectly decided the ultimate or final issues raised in a motion to suppress. When reviewing this type of claim, an appellate

court must independently determine, without deference to the trial court's conclusion, whether the facts meet the appropriate legal standard in any given case. *State v. Curry*, 95 Ohio App.3d 93, 96,620 N.E.2d 906 (8th Dist.1994).

{¶30} In this case, Walter argues the trial court incorrectly decided the ultimate or final issue raised in the motion to suppress. He states the trial court erroneously found the exigent circumstances existed to permit the warrantless search of the premises.

**Exigent Circumstances**

{¶31} The Fourth Amendment to the United States Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures * * *." *State v. Diaz*, 5th Dist. No. 2016 CA 00113, 2017-Ohio-262, 81 N.E.3d 866, 2017 WL 361429, ¶ 15. The government may not intrude into areas where legitimate expectations of privacy exist. In determining whether the Fourth Amendment protects against a search, "the rule that has emerged * * * is that there is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.' " *State v. Schorr*, 5th Dist. Fairfield No. 13-CA-45, 2014-Ohio-2992, 2014 WL 3031122, ¶ 24 *Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), (Harlan, J., concurring); *See Rakas v. Illinois*, 439 U.S. 128, 143–144, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); *State v. Williams*, 73 Ohio St.3d 153, 166–167, 652 N.E.2d 721 (1995).

{¶32} A warrantless search of a person's home is presumed unreasonable unless an exception to the warrant requirement is shown. *State v. Diaz*, 2017-Ohio-262 at ¶ 16 citing *State v. Angelo*, 9th Dist. Summit No. 24751, 2009-Ohio-6966, 2009 WL 5174158,

¶ 10. There are several judicially recognized exceptions to the search warrant requirement: (a) [a] search incident to a lawful arrest; (b) consent signifying waiver of constitutional rights; (c) the stop-and-frisk doctrine; (d) hot pursuit; (e) probable cause to search and the presence of exigent circumstances; (f) the plain-view doctrine; or (g) an administrative search. *State v. Crawford*, 5th Dist. Richland No. 2018 CA 0063, 2019-Ohio-1507, 2019 WL 1773189, ¶¶ 19-20 citing *State v. Smith*, 5th Dist. Licking No. 18 CA 00011, 2018-Ohio-3436, ¶ 18 citing *State v. Akron Airport Post No. 8975*, 19 Ohio St.3d 49, 51, 482 N.E.2d 606 (1985), certiorari denied, 474 U.S. 1058, 106 S.Ct. 800, 88 L.Ed.2d 777 (1986); *Stone v. Stow*, 64 Ohio St.3d 156, 164, 593 N.E.2d 294, fn. 4 (1992).

{¶33} In this case, the State argues exigent circumstances existed to permit the Cambridge Police Department to enter and search Walter's home without a warrant. The exigent circumstances exception "is founded on the premise that the existence of an emergency situation, demanding urgent police action, may excuse the failure to procure a search warrant." *State v. Owens*, 5th Dist. Stark No. 2018CA00015, 2018-Ohio-4225, 2018 WL 5096082, ¶ 22 quoting *State v. Cheadle*, 2nd Dist. Miami No. 00CA03, 2000 WL 966167, (July 14, 2000). The ongoing emergency or exigent circumstance "make[s] the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment." (Brackets, quotation marks, and citations omitted.) *Kentucky v. King*, 563 U.S. 452, 460, 131 S.Ct. 1849, 179 L.Ed.2d 865 (2011).

{¶34} Exigent circumstances have been held to exist when law enforcement needs "to assist persons who are seriously injured or threatened with such injury," or, phrased differently, to provide "emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Brigham City v. Stuart*, 547 U.S. 398, 403, 126 S.Ct.

1943, 164 L.Ed.2d 650 (2006); see also *Michigan v. Fisher*, 558 U.S. 45, 47-48, 130 S.Ct. 546, 175 L.Ed.2d 410 (2009) (per curiam). "Whether exigent circumstances are present is determined through an objective test that looks at the totality of the circumstances confronting the police officers at the time of the entry." *Id.* quoting *State v. Enyart*, 10th Dist. Franklin Nos. 08AP–184, 08AP–318, 2010-Ohio-5623, 2010 WL 4681889, ¶ 21. The police "bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests." *State v. Hodge*, 2nd Dist. Montgomery No. 23964, 2011-Ohio-633, 2011 WL 486516, ¶ 24 quoting *Welsh v. Wisconsin*, 466 U.S. 740, 750, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984).

{¶35} The State contended the 911 hang-up call created the reasonable belief that an emergency existed requiring an investigation by the Cambridge Police Department. Sgt. Wolfe testified the Cambridge Police Department had a policy of investigating all 911 calls until it could prove there was not an emergency at hand.

{¶36} The Third District Court of Appeals has held that a 911 hang-up call is "inherently" an emergency. In *State v. Myers*, 3rd Dist. Marion Nos. 9-02-65, 9-02-66, 2003-Ohio-2936, it stated:

> We refuse to base the reasonableness of a warrantless entry into a home
> from which a 911 call has originated, and the nature of which is unknown,
> on the percentage of these types of calls that are non-emergencies in
> nature. Rather, we find these types of calls to inherently be emergencies.
> In fact, the emergency of these situations only ceases once the emergency
> responder is able to ascertain whether someone is in need of aid. Once the
> responder discovers that no emergency exists, there is no need to further

investigate. However, at times, this discovery can only be made by gaining

entrance to the location from which the call was placed. The mere absence

of sounds is not always a sufficient basis to determine whether someone in

the home needs immediate aid, especially when other information exists

that would lead one to reasonably believe that someone is inside the home.

The person in need of aid could be unconscious or otherwise debilitated. In

addition, there may be sounds of distress within the home but which are

inaudible to those on the outside of the home.

*Id.* at ¶ 12. The Eighth District held that a 911 hang-up call provided sufficient exigent

circumstances to allow police to make a warrantless entry into the home. *Lakewood v.

Simpson*, 8th Dist. Cuyahoga No. 80383, 2002-Ohio-4086, ¶ 15. The Second District

found a 911 hang-up call creates a circumstance where a reasonable investigation can

be made. *State v. Hunter*, 2nd Dist. Montgomery No. 24350, 2011-Ohio-6321, ¶ 18 citing

*State v. Hodge*, 2nd Dist. Montgomery No. 23694, 2011–Ohio–633.

{¶37} A review of these cases, however, shows the courts did not find that exigent

circumstances only existed by virtue of the 911 hang-up call. The courts conducted an

analysis of the facts and circumstances surrounding the 911 hang-up call to determine

whether exigent circumstances existed to allow the police officer to make a warrantless

entry into the home where the call originated. For example, in *State v. May*, the Fourth

District cited to *Myers* and *Simpson*, but conducted this analysis to find that exigent

circumstances existed:

* * * [T]he Highland County Sheriff's Department received two 911 hang-up

calls from the same address. Deputy Putnam testified that during the final

call, he heard soft whispering in the background that increased his concern that a female domestic violence victim may be involved. Also, records revealed that a woman owned the property. In light of these facts, we conclude, as did the trial court, that Officer Sines had a duty to enter the home to inquire whether residents needed assistance. Also, the exigent circumstances that gave rise to that duty did not vanish simply because appellant informed Officer Sines that he did not need assistance. Logic and public policy dictate that an officer need not always accept the word of a highly agitated individual, who had already threatened the officer with violence, that assistance is not needed. To the contrary, in light of the two 911 hang-up calls, the whispering that Deputy Putnam thought he heard, and the fact that a woman owned the property, Officer Sines properly pursued the investigation.

(Footnote omitted.) *State v. May*, 4th Dist. Highland No. 06CA10, 2007-Ohio-1428, ¶ 13.

{¶38} In the case sub judice, the Guernsey County Sheriff's Department transferred a 911 hang-up call to the Cambridge Police Department. Dispatch called the number back and the man answering the phone said his child made the call and law enforcement was not needed. Sgt. Wolfe was dispatched to the home because it was the policy of the Cambridge Police Department to investigate 911 calls. When the police arrived at the home, the officers did not hear any noise or disturbances coming from inside. They knocked on multiple doors and windows and called out to the occupants for a long period of time with no response. Sgt. Wolfe opened a window and there was no sound coming from inside. The officers were able to see through the windows of the front

door and did not see any disturbances. Sgt. Wolfe can be heard on the body cam asking dispatch if the person who made the call sounded like they were in distress. The dispatcher told Sgt. Wolfe it was not a child, but an adult who made the call and said one word, "Cambridge," before hanging up. She could not tell if the caller was in distress. When dispatch called the phone number back, the male who answered the phone said no law enforcement was needed. A.C.W. came to the front door after it popped open. She stated there was no emergency. N.W. and Walter next came to the door and stated there was no emergency.

{¶39} Under these facts and circumstances, we conclude exigent circumstances did not exist for the Cambridge Police Department to make a warrantless entry into the home. We do not find, after considering the totality of the circumstances, that there was an emergency situation after the 911 hang-up call, demanding urgent police action. The Cambridge Police Department thoroughly inspected the outside of the home and attempted to alert the unknown occupants. From the details of the 911 hang-up call and the officers' inspection of the outside of the home, there did not appear to be circumstances within the home requiring immediate emergency assistance.

{¶40} Our analysis of whether the trial court erred in granting the motion to suppress, however, does not end here. There was a detail raised in the testimony and shown in the body cam video that requires our analysis – Walter's consent to search the home.  The issue was also raised in the State's brief.

### Consent

{¶41} "One specifically established exception to the warrant requirement is 'a search that is conducted with consent.' " *State v. Diamond*, 10th Dist. Franklin No. 18AP-

489, 2019-Ohio-2527, 2019 WL 2605219, ¶ 15 quoting *State v. Hawkins*, 10th Dist. No. 15AP-35, 2016-Ohio-1404, ¶ 98, quoting *State v. Portman*, 2nd Dist. No. 2013-CA-68, 2014-Ohio-4343, ¶ 11, citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Consent to enter a residence can be given by anyone who possesses common authority over the premises, and in particular, by the resident of a home. *See United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *State v. Greer*, 39 Ohio St.3d 236, 530 N.E.2d 382 (1988).

{¶42} Walter was the owner of the residence. (T. 21). As seen on the body cam video, Sgt. Wolfe asked Walter if he consented to a protective sweep of the residence. The body cam video shows that Walter consented to the protective sweep. During the sweep, the officers observed a firearm case and ammunition in plain view in the home. The video recording ended during the protective sweep. Sgt. Wolfe testified:

Q. Okay. When you completed your sweep, what did you do – what happens next?

A. Well, at that point we had observed the ammunition and everything in plain view in the firearm case, and I spoke to Patrolman Eubanks, and we went outside and spoke to Mr. Walter, Patrolman Eubanks spoke to Mr. Walter.

Q. Did he give you consent to search the residence at that point?

A. Yes, sir.

(T. 14-15).

{¶43} Walter argued the trial court incorrectly decided the ultimate or final issues raised in the motion to suppress. Under this standard of review, we independently

determine, without deference to the trial court's conclusion, whether the facts meet the appropriate legal standard. In this case, while we find the facts and circumstances did not support the exigent circumstances exception for the Cambridge Police Department to conduct a warrantless search of Walter's residence, the evidence shows that Walter consented to the warrantless search of the residence. As such, we find no error to deny Walter's motion to suppress.

{¶44} Walter's sole Assignment of Error is overruled.

## CONCLUSION

{¶45} The judgment of the Guernsey County Court of Common Pleas is affirmed.

By: Delaney, J.,

Wise, John, P.J. and

Wise, Earle, J., concur.

*Wise, John, P. J., concurring opinion*

{¶46} I concur in the result of the majority opinion in authorizing the warrantless search of Appellant's residence.  I write separately because, while I concur with the majority's decision on the issue of consent to search, I would not address the issue of exigent circumstances. The evidence supports the majority opinion that Walter consented the warrantless search of his residence.  However, I find the consent to search resolves the issue of the validity of the warrantless search and therefore find it unnecessary to address the issue of whether the evidence supported the exigent circumstances exception for a warrantless search.