[Cite as *State v. Hawkins*, 2016-Ohio-1404.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                              :

      Plaintiff-Appellee,          :           No. 15AP-35
                                           (C.P.C. No. 12CR-5591)
v.                                         :
                                           (REGULAR CALENDAR)
Dartanian Hawkins,                          :

      Defendant-Appellant.        :

---

D E C I S I O N

Rendered on March 31, 2016

---

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Sheryl L. Prichard*, for appellee. **Argued:** *Sheryl L. Prichard.*

**On brief:** *The Law Office of Thomas F. Hayes, LLC*, and *Thomas F. Hayes*, for appellant. **Argued:** *Thomas F. Hayes.*

---

APPEAL from the Franklin County Court of Common Pleas

BROWN, J.

{¶ 1} This is an appeal by defendant-appellant, Dartanian Hawkins, from a judgment of conviction and sentence entered by the Franklin County Court of Common Pleas following a jury trial in which the jury returned verdicts finding him guilty of aggravated murder, kidnapping, and aggravated robbery.

{¶ 2} On October 31, 2012, a Franklin County Grand Jury returned an indictment against appellant for two counts of aggravated murder, in violation of R.C. 2903.01, one count of kidnapping, in violation of R.C. 2905.01, and one count of aggravated robbery, in violation of R.C. 2911.01. On November 15, 2012, a Franklin County Grand Jury returned an indictment against appellant's co-defendant, Maxamillion Williams, for two counts of

aggravated murder, one count of murder, one count of aggravated robbery, one count of kidnapping, and one count of tampering with evidence. The indictments arose out of the strangulation death of Michael Payne on October 19, 2012.

{¶ 3} The cases were tried jointly to a jury beginning December 9, 2014. In the early morning hours of October 20, 2012, Whitehall Police Sergeant Rex Adkins received a dispatch regarding the discovery of a body "wrapped in trash bags laying in the roadway on Eastway Court," Whitehall. (Tr. Vol. I, 57.) Upon arriving at the scene, Sergeant Adkins checked the body and detected no pulse.

{¶ 4} Whitehall Police Detective Steven Brown was dispatched to the scene that morning and observed a "body * * * at the curb." (Tr. Vol. I, 70.) The body was "naked with the top half covered by one trash bag and the bottom half by another." (Tr. Vol. I, 70.) Law enforcement personnel identified the victim as Michael Payne, a Whitehall resident.

{¶ 5} Detective Brown contacted the victim's parents, who provided the detective with the name "Amy Lambert," a "woman who is said to be his girlfriend, who he had been seeing for years and who had recently gotten out of jail after doing four years." (Tr. Vol. I, 78-79.) Payne's parents "were immediately suspicious of her." (Tr. Vol. I, 79.) The parents last saw their son "the previous day, Friday the 19th, around 12:30 in the afternoon" as he was "getting into his Yukon and Amy was in the vehicle." (Tr. Vol. I, 79.) Lambert "appeared to be hiding in the front seat," knowing that "the parents don't like her." (Tr. Vol. I, 79.) The parents provided information regarding an apartment complex where Lambert "was last known to be staying." (Tr. Vol. I, 79.) Payne's parents also informed the detective that their son had purchased a life insurance policy benefiting "Amy Lambert, another reason that they felt she might be involved." (Tr. Vol. I, 106.) Detective Brown later learned that Payne had taken out a $100,000 life insurance policy with American Family Insurance, naming Lambert as the sole beneficiary.

{¶ 6} Police detectives subsequently located the victim's Yukon at an apartment complex, and observed trash bags in the cargo area. Detective Brown described the trash bags found covering the victim's body as "very unique. They were a metallic silver with a bright blue tie, not the typical black or white trash bags." (Tr. Vol. I, 81.) Detectives observed "one of those trash bags" in the back of the Yukon, which "immediately led us to

believe that this vehicle and/or Amy had something to do with the murder."  (Tr. Vol. I, 81.)

{¶ 7}   Detectives then drove to an apartment building located on East Livingston Avenue, where they observed a female following a male down the stairwell of the building. The male was carrying a large black trash bag and a smaller grocery bag.  One of the detectives approached the woman and showed her a picture of Lambert. The female "denied knowing her, and * * * identified herself as Faustina."  (Tr. Vol. I, 84.)  After further questioning, the woman admitted that she was Lambert.

{¶ 8}   Detective Brown questioned the male, later identified as Jeffrey Bagley.  The man appeared nervous, and denied knowing Lambert.  Detective Brown placed him under arrest after learning that the woman at the scene was Lambert.  Detective Brown looked inside the black bag and "immediately saw * * * one of those silver-with-blue-tie trash bags, just like the body had been * * * dumped in."  (Tr. Vol. I, 86.)  Upon looking inside the grocery bag, the detective "could see a black garment with what looked to be blood on it." (Tr. Vol. I, 86.)

{¶ 9}   Detective Brown observed what "appeared to be the clothing, shoes, from the victim" inside the bags.  (Tr. Vol. I, 92.)  The investigation revealed "attempts to clean the body of evidence."  (Tr. Vol. I, 92.)  Detectives found two pair of latex gloves, as well as "bowls and tooth brushes," and they noticed a strong chemical odor.  (Tr. Vol. I, 92.) Detectives "learned that bleach water was put in these bowls," and the victim's hands were "soaked in them" and "the tooth brushes had been used to clean his fingernails in [an] attempt to hide potential evidence."  (Tr. Vol. I, 93.)  Detectives also found an HDMI computer cable cord that was "consistent" with what the investigation revealed was the likely murder weapon used to strangle the victim.  (Tr. Vol. I, 92.)  Detectives later compared the metal mesh pattern on the cord they found with markings on the victim's neck, and "the markings on the neck * * * were consistent with this."  (Tr. Vol. I, 95.)

{¶ 10}   Detectives found a variety of clothing, including "a Michigan sweatshirt, which Mr. Payne's parents had said he was likely to be wearing."  (Tr. Vol. I, 94.)  The clothing had been "cut off of the victim."  (Tr. Vol. I, 94.)  Detectives found a blood stained blue blanket with a "Big Deals" store tag, as well as a pair of gray sweatpants containing a blood stain.  (Tr. Vol. I, 97.)  In Bagley's pant's pocket, detectives recovered a Wal-Mart

receipt, dated October 20, 2012, for the purchase of a cleaning product, as well as a "Discover Card cut in half in the name of Michael Payne." (Tr. Vol. I, 104.)

{¶ 11} Detectives surmised that Bagley was walking to the dumpster to dispose of these items when they encountered him. A subsequent search of the dumpster revealed two silver trash bags containing "vinyl gloves, some plastic gloves, [a] plastic Baggie with paper bindles that indicated drug use, and * * * a handwritten document that was linked to [Williams]." (Tr. Vol. I, 106.)

{¶ 12} Detectives recovered a receipt from a Big Deals store for the purchase of cleaning supplies on October 19, 2012, at 7:20 p.m. Surveillance video the police later obtained from the store revealed that "Maxamillion Williams and Amy Lambert were in Deals making this purchase." (Tr. Vol. I, 109.) In the video, Williams was depicted wearing sweatpants "consistent with the sweatpants" detectives "found in the trash bag with the bloodstain on them." (Tr. Vol. I, 110.)

{¶ 13} During the investigation, detectives obtained property belonging to appellant, including a pair of jeans with a blood spot on an inside pocket, as well as a black backpack; the backpack contained an American Family Insurance vehicle insurance card bearing the name of Michael Payne, and a Reynoldsburg United Methodist Free Store membership card in the name of Michael Payne. Detectives recovered some of these items, including the jeans, from the Columbus residence of appellant's mother; she provided detectives with three trash bags full of clothing and other personal items. The clothing was located in a shed outside the residence.

{¶ 14} Other items belonging to appellant, including the backpack, were recovered from the home of Robert Dalton's mother. The investigation revealed that appellant had been staying with Dalton, at the home of Dalton's mother, around the time of the murder. Dalton's mother called Detective Brown and told him "she had some of [appellant's] personal effects that she didn't know what to do with." (Tr. Vol. I, 149.) The detective went to her residence and she handed Detective Brown a trash bag full of items. Detectives later learned that Dalton was present when Payne was murdered.

{¶ 15} Following Lambert's initial arrest, detectives had not yet established her involvement, and she was released and "placed * * * with her grandfather" because "the story" she was providing detectives was that she was in fear of appellant and Williams.

(Tr. Vol. I, 125.)  Several hours later, after obtaining additional information, detectives returned to Lambert's grandfather's residence to place her under arrest.  Lambert, however, "had left her grandfather's house, had stolen his vehicle and stolen his debit card."  (Tr. Vol. I, 125.)  Police subsequently arrested Lambert in Miami, Florida, and law enforcement personnel transported her back to Ohio.

{¶ 16} The day after the incident, Williams "flew from Port Columbus to Miami" and boarded a cruise ship.  (Tr. Vol. I, 126.)  The ship made a stop in Cozumel, Mexico, and Williams "got off the cruise ship in Cozumel and did not reboard."  (Tr. Vol. I, 126.)  Law enforcement personnel subsequently arrested Williams in Mexico, and he was returned to the United States.  Appellant made arrangements to turn himself into police.  Police detectives obtained cell phone records of Williams and appellant.

{¶ 17} The Bureau of Criminal Investigation ("BCI") assisted the Whitehall Police Department with the homicide investigation.  BCI Agents Stephanie Herron and Todd Fortner collected 34 items from an apartment leased by Williams at the Embassy Plaza Apartments, located at 4069 East Livingston Avenue.  Agent Herron identified silver trash bags with blue ties found in the apartment similar to the bags used to wrap the victim's body.  Agents also found fingernail clippers, scissors, a payment voucher for a GMC Yukon, a credit/debit card in the name of Michael Payne, a firearm, and latex gloves.  Agents also collected items from the Yukon, including a blanket with bloodstains and a silver trash bag.  Agent Herron subsequently examined the victim's body and noted that his fingernails had been clipped short, and that "one of his fingernails was clipped back so far that there was a little bit of blood there."  (Tr. Vol. II, 221.)

{¶ 18} Dalton, age 22, testified that he grew up with appellant in Columbus.  Appellant stayed at the home of Dalton's mother during an approximately two-month period near the time of the events at issue.  Appellant had nicknames of "D" or "Tain."  (Tr. Vol. II, 243.)  Dalton knew Williams through appellant.

{¶ 19} Dalton gave the following account of the events on October 19, 2012.  That morning, Dalton was at Williams' apartment where he had spent the previous evening.  Also present were Lambert, Williams, Bagley, Payne, and an individual named "Duke."  (Tr. Vol. II, 246.)  Appellant had also been at Williams' apartment, but had left to visit his girlfriend.  Lambert introduced Payne as her fiancé.  Payne was only at the apartment for

approximately 15 minutes that morning and left with Lambert.  Bagley and Duke also left the apartment during the morning.

{¶ 20} Later that day, Lambert returned to the apartment "and got [Williams]. And [Williams] was getting ready to go with her."  (Tr. Vol. II, 248.)  Lambert and Williams told Dalton "to stay, they would be right back there.  They were going to get [appellant]." (Tr. Vol. II, 248.)  Later, while alone in the apartment, Dalton heard the sound of a male screaming outside.  Lambert came inside the apartment "looking for something." (Tr. Vol. II, 251.)  Appellant and Williams then entered the apartment with Payne.  Appellant and Williams were fighting with Payne, who did not want to come inside.

{¶ 21} The two men forced Payne inside, and closed the door; Williams and appellant "were jumping him."  (Tr. Vol. II, 253.)  The two men took Payne down the hallway toward the bathroom.  Dalton remained on the couch during this time because he "was scared." (Tr. Vol. II, 254.)  Inside the bathroom, Williams and appellant "put a backpack over [Payne's] head, [and] continued to beat him." (Tr. Vol. II, 254.)  The two men were "punching and kicking" Payne.  (Tr. Vol. II, 254.)  Lambert was "running around the house" helping Williams and appellant, and she took a cord from behind a television.  (Tr. Vol. II, 255.)

{¶ 22} Payne eventually "fell to the ground."  (Tr. Vol. II, 255.)  Payne was lying on the floor and appellant was strangling him with a cord.  Payne was "trying to push him off of him, fight[ing] back."  (Tr. Vol. II, 257.)  Payne "[f]ought hard," but he eventually stopped struggling, and appeared to be unconscious.  (Tr. Vol. II, 257.)  During the time Payne was on the ground, Lambert removed Payne's wallet from his back pocket and was sorting through it.  After Payne was strangled, Lambert "clipped his nails.  She said he scratched her." (Tr. Vol. II, 258.)  Dalton was told to "mind my business, stay out of it." (Tr. Vol. II, 258.)

{¶ 23} Approximately one hour after the incident, Bagley and Duke arrived at the apartment.  Bagley later drove appellant and Dalton to the residence of Dalton's mother. Appellant remained at the Dalton residence until the following morning; he then "packed up his stuff, and * * * left." (Tr. Vol. II, 260.)  Some of appellant's personal belongings remained at the Dalton residence.  Police officers spoke with Dalton approximately one

week later.  Dalton initially told the officers he had not witnessed the murder.  After the officers indicated they did not believe him, Dalton "told the truth."  (Tr. Vol. II, 261.)

{¶ 24} Bagley, age 34, acknowledged several prior convictions, as well as drug problems, including the use of heroin in 2012; Bagley purchased heroin from Williams during that time.  Bagley stole from retail stores, such as "Lowe's," to pay Williams for heroin.  (Tr. Vol. II, 329.)

{¶ 25} On October 19, 2012, Bagley was at Williams' residence when he met David Hawkins (hereafter "David").  That morning, Bagley and David left the residence and drove to Marysville, where Bagley committed store thefts to pay for drugs.  After leaving Marysville, Dublin police officers stopped their vehicle a short time later.  Bagley received a ticket for driving without a license, and the officers impounded his vehicle.  Bagley and David returned to Williams' apartment by bus later that night, arriving at approximately 7:00 p.m.

{¶ 26} When David and Bagley arrived back at the apartment, appellant was "surprised, like * * * just caught * * * by surprise me being there with [David]."  (Tr. Vol. II, 335.) Bagley then observed "part of the body that was laying in the hallway."  The victim was wearing a Michigan sweatshirt, and "his head was wrapped in a book bag." (Tr. Vol. II, 336.)  Bagley knew that the victim was "[Payne], Amy's boyfriend," who had been at the apartment earlier in the day.  (Tr. Vol. II, 336.)  Appellant was holding a gun in his hand, and he told Bagley "to help." (Tr. Vol. II, 337.)

{¶ 27} A short time later, Williams and Lambert arrived at the apartment with a blanket and some rubber gloves.  Appellant, Williams, and Lambert went inside the bathroom and held a discussion.  After Williams came out of the bathroom, he said to Bagley: "Man, you know, can't say nothing, man.  You know, I need you to help me out." (Tr. Vol. II, 338.)  Bagley was scared, and Williams told Bagley: "I needed to help * * * get rid of the body."  (Tr. Vol. II, 338.)  Williams first asked Bagley to drive appellant and another individual to a residence.  During the trip, appellant said to Bagley, "Don't tell, man.  I want to watch my kids grow up."  (Tr. Vol. II, 341.)

{¶ 28} Bagley then returned to Williams' apartment. David was arguing with Lambert, "telling her that she was a piece of crap and * * * that she was cold hearted and all.  He was just cussing her out."  (Tr. Vol. II, 342.)  At one point, Lambert said "he

[Payne] got what he deserved."  (Tr. Vol. II, 376.)  Lambert was also "talking about getting money from [Payne] having an insurance policy and that it was coming to her and that she would give everybody a little bit of money if they just keep their mouth shut."  (Tr. Vol. II, 345.)  That evening, Bagley gave Williams a ride to pick up a passport and documents for a cruise Williams was taking to Jamaica.  During the drive, Williams said to Bagley: "Don't tell, man.  If anything happens, don't tell, man.  I got you, you know, when I get back.  Ain't got a lot of money right now."  (Tr. Vol. II, 345.)  They then returned to Williams' apartment.

{¶ 29} Later that evening, Lambert removed the clothing from Payne, and Lambert and David wrapped the body in a blanket.  Williams moved the Yukon to the back of the apartment near a side door.  Bagley, David, and Lambert then carried the body outside and placed it in the Yukon.  Lambert said that Bagley needed to deposit the body "at a certain apartment in Whitehall off Broad Street to make it look like a robbery."  (Tr. Vol. II, 339.)  Bagley drove the vehicle by himself and left the body "at that apartment complex."  (Tr. Vol. II, 377.)

{¶ 30} Bagley then drove to a Wal-Mart, where he purchased cleaning supplies.  When Bagley returned to the apartment, Lambert was placing items inside a trash bag, including clothes, a bowl, and a credit card.  All four individuals then left the apartment; David left on foot, while Bagley, Lambert, and Williams drove to the airport.  During the drive, Williams told Bagley to take care of his apartment, and he admonished Bagley not to say anything "if * * * anything happens" while he was gone.  (Tr. Vol. II, 350.)  After dropping off Williams, Bagley and Lambert returned to the apartment.  Lambert then "cleaned out the truck.  She wiped it down.  She had the trash bag already tied up and in the house."  (Tr. Vol. II, 350.)  Bagley and Lambert remained in Williams' apartment that night, and they "got high" on drugs.  (Tr. Vol. II, 351.)

{¶ 31} The next morning, Lambert told Bagley that "we got to get ready to leave, that [appellant's] going to be coming over."  (Tr. Vol. II, 351.)  Bagley exited the apartment with a trash bag, and Lambert told him to "throw that in the trash while she goes to get the truck."  (Tr. Vol. II, 351.)  As Bagley walked outside, a police detective was standing there with "this book in his hand.  And he asked me, 'Have you seen this person?' "  (Tr. Vol. II, 351.)  Bagley looked at the photograph. "It was Amy."  (Tr. Vol. II, 351.)  Bagley

"told him no." (Tr. Vol. II, 351.) At that time, another detective "opened the door * * * and said, 'Grab him.' He grabs me. Puts me in handcuffs. He looks in the bag." (Tr. Vol. II, 351.) As they were talking, "[appellant] came walking up. He went in the building, and then he came back out" and left the area. (Tr. Vol. II, 352.)

{¶ 32} At the time, Bagley was wearing a hoodie that belonged to Williams, and detectives "found the credit card in the pocket belonging to that [Payne] guy." (Tr. Vol. II, 352.) Initially, Bagley did not tell detectives everything he knew, including his involvement in helping to move the body, because he was "scared." (Tr. Vol. II, 352.) After his arrest, Bagley spoke with Detective Brown on a second occasion and "told him the truth." (Tr. Vol. II, 354.)

{¶ 33} David, age 61, also goes by the name "Duke" or "Uncle Duke." (Tr. Vol. II, 394.) David's sister adopted appellant, and David knows appellant as "Tain." (Tr. Vol. II, 394.) David knows Williams as "Max." (Tr. Vol. II, 395.)

{¶ 34} On the morning of October 19, 2012, David was at Williams' apartment, having spent the prior evening there. David accompanied Bagley to Marysville that morning, unaware that Bagley intended to steal items from a store. They first stopped at a Lowe's store, and then drove to a Home Depot. Bagley "comes running out with a spool of wire," and "[o]ne of the customers followed him." (Tr. Vol. II, 399.) Dublin police officers subsequently stopped Bagley's vehicle. Bagley did not have a valid driver's license, and the officers had the vehicle towed.

{¶ 35} David and Bagley returned to Williams' apartment by bus, arriving at approximately 7:00 p.m. Appellant let the two men inside the apartment. A "light-skinned" male was also in the apartment with appellant. (Tr. Vol. II, 407.) Upon entering, David observed "a body on the floor" in the hallway. (Tr. Vol. II, 403.) The victim's head was positioned "toward the living room and his feet * * * pointing straight down the hall." (Tr. Vol. II, 403.) The victim was wearing a Michigan sweatshirt, and his head was covered in a "book bag." (Tr. Vol. II, 404.) David "couldn't believe it," and he walked "over there to look." (Tr. Vol. II, 404.) He "pulled the bag back and looked at his face." (Tr. Vol. II, 404.) The victim's left eye was swollen shut, and "he had been beat in the face." (Tr. Vol. II, 404.) There was a cord wrapped around the victim's neck. David

was told to "go sit down and watch TV and, if I see anything, don't even pay no attention." (Tr. Vol. II, 405.)  Appellant was holding a gun at the time.

{¶ 36} Approximately 45 minutes later, Williams and Lambert arrived at the apartment with cleaning supplies.  Lambert "went into a little act * * * preaching to a dead man."  (Tr. Vol. II, 407.)  David "knew she already had her anger problem, but she really went off that night."  (Tr. Vol. II, 407-08.)  According to David, "[s]he was like, 'How you like that, Michael,' you know, and 'I hope you appreciate it now.' And, 'What are you going to do now?'  I mean, talking to him like he's alive."  (Tr. Vol. II, 408.)  Later, David observed appellant and Williams go into the bedroom.  Appellant and the light-skinned individual eventually left the apartment.

{¶ 37} Williams gave David five dollars and asked him to go with Lambert to purchase some gloves.  David went because he was scared; after purchasing gloves at a nearby beauty store, they returned to the apartment, and Bagley and Lambert began "cleaning up."  (Tr. Vol. II, 411.)  Lambert took scissors and cut Payne's clothing off. Later, Lambert and Bagley wrapped Payne's body in a blanket. David, Bagley, and Lambert then carried the body down the hallway and out a back door, near the parked Yukon.  Bagley then drove away with the body.  The other individuals were preparing to leave for the airport, and David saw this as his opportunity to "get out of there," and he "left in a hurry."  (Tr. Vol. II, 413.)  Later, David received a call from Williams, who was calling from a cruise ship.  Williams "wanted to know why did everybody find out what happened so fast."  (Tr. Vol. II, 426.)

{¶ 38} Lambert, age 29, has prior convictions for felony theft, burglary, and identity theft.  Lambert testified that she entered into a proffer agreement with plaintiff-appellee, State of Ohio, to testify in the instant case, with a joint recommendation for a 20-year sentence. Lambert first met Payne when she was 12 years old, after she was placed in foster care; Payne, who was 22 years old at the time, was "related to the foster-care people."  (Tr. Vol. III, 448.)  Payne "formed an attraction to me right away.  He really liked me.  So then we just hung out a lot."  (Tr. Vol. III, 448.)  Lambert later returned to her mother's custody, but remained in contact with Payne.  After Lambert turned 18, her relationship with Payne "was always the same.  He just always helped me out and gave me money and always wanted to be with me."  (Tr. Vol. III, 451.)  Lambert, who began using

drugs at age 12, needed money for drugs and clothing.  Payne and Lambert never had sexual relations.

{¶ 39} Lambert eventually developed a heroin habit, "shooting heroin a lot throughout the day."  (Tr. Vol. III, 453.)  Lambert paid for her habit by stealing items from stores and then selling the items or returning the items to the store in exchange for gift cards.  She served a four-year prison sentence for burglary and identity theft from 2008 to 2012.  While in prison, she remained in touch with Payne, who would do "[w]hatever I asked pretty much.  He would give me money whenever I asked for it."  (Tr. Vol. III, 455.)

{¶ 40} In February 2012, following her release from prison, Lambert initially resided with her mother.  Payne provided money to Lambert through a paper route and a lawn care service.  Payne also took out a life insurance policy in the amount of $100,000, naming Lambert as the sole beneficiary.  Lambert told Payne that she would marry him someday, but she had no real intent to do so because she "wasn't in love with him."  (Tr. Vol. III, 461.)  Lambert told Payne she would marry him "[t]o make him happy so that he would help me out more."  (Tr. Vol. III, 462.)  Lambert acknowledged she was using Payne.

{¶ 41} Approximately three months after her release from prison, Lambert began using heroin again but did not tell Payne. Lambert often used Payne's Yukon for transportation.  By October 2012, Lambert's heroin habit was "really bad," and she was also "smoking crack."  (Tr. Vol. III, 467.)  Lambert no longer lived at her mother's residence.  She "bounced around a lot" at different locations, and eventually stayed with Williams.  (Tr. Vol. III, 468.)  Williams sold heroin and crack to her, and Lambert eventually began a sexual relationship with him.  Payne was unaware of this relationship or that she was residing with Williams.  At the time, Lambert was spending approximately $200 per day on her heroin habit, but later she began consuming $400 to $500 per day of heroin.  Lambert was again stealing to support her habit, and she also received money from Payne.  Eventually Lambert had difficulty paying Williams for the drugs.

{¶ 42} Once, while Lambert and Williams were riding in the Yukon, Williams "said if I didn't pay him, he would just kill Michael.  And I was joking, when I said, 'If you do that, you'll just do me a favor.'  And he was like, 'Oh, yeah, the policy.' "  (Tr. Vol. III, 474.)  Approximately one week later, Williams "said something like, you know, 'I could take care

of that for you.  I could * * * help you with that.'  And I was like, 'okay.' " (Tr. Vol. III, 475.) Lambert did not think he was serious, but when Williams brought the subject up a third time she "realized that he was being serious about it.  And [she] agreed upon it."  (Tr. Vol. III, 475.)  When Williams suggested killing Payne to obtain the insurance money, Lambert thought "it just sounded like a good idea."  (Tr. Vol. III, 476.)

{¶ 43} Lambert told Williams that the death would have to look like an accident. Initially, Williams was "going to have somebody else do it."   (Tr. Vol. III, 476-77.) Lambert did not discuss the details with Williams because "that was kind of more his thing."  (Tr. Vol. III, 477.)   Williams was planning to leave for a cruise on October 20, 2012, and he "wanted to get it done before the cruise, and * * * it wasn't really - - a really good, set-out plan."  (Tr. Vol. III, 478.)  Lambert "wasn't supposed to have anything to do with it, but in the end [she] had lots of involvement in it."  (Tr. Vol. III, 478.)

{¶ 44} On October 18, 2012, Lambert spent the night at Williams' apartment. Other individuals were at the apartment, including David, Bagley, and appellant, who Lambert referred to as "Tain."  (Tr. Vol. III, 480.)  On the morning of October 19, "the plan was to get [Payne] over to the house.  I didn't really know too much after that."  (Tr. Vol. III, 481.)  Lambert "didn't know it was going to happen at the apartment."  (Tr. Vol. III, 482.)

{¶ 45} Lambert left the apartment and went to the residence of Payne's parents. Payne and Lambert then drove to Williams' apartment because "[Williams] wanted [Payne] there."  (Tr. Vol. III, 484.)  They remained at the apartment for a while, but Payne "had seen the [drug] scales [Williams] had out, and he kind of knew what was going on. And he didn't want to be over there."  (Tr. Vol. III, 485.)  Payne walked out of the apartment, and Lambert ran after him because she "needed to get him back to [Williams'] apartment."  (Tr. Vol. III, 486.)  Lambert found Payne, and they drove to a bank "to get his money pulled out."  (Tr. Vol. III, 486.)  They got into an argument because "he didn't want to give me money."  (Tr. Vol. III, 486.)  Lambert was upset because she needed money to pay Williams.

{¶ 46} Later that day, Lambert told Payne she was using drugs again, and that she needed money for "Suboxone," a medication used to treat heroin addition.  (Tr. Vol. III, 488.) After the argument, they drove back to Williams' apartment, and Lambert

attempted to get Payne back inside the apartment but he refused.  Lambert ran up to the apartment and told Williams, who responded: " 'Well, you got to.'  So I was like, 'All right.' " (Tr. Vol. III, 489.)  Lambert thought she might be able to "drug him so that he would be asleep so we could get him up in the apartment."  (Tr. Vol. III, 489.)

{¶ 47} Lambert returned to the Yukon, and Payne and Lambert drove to pick up papers for Payne's newspaper delivery route.  Later, when Payne was out of the vehicle for a short time, Lambert placed some sleeping pills in Payne's soft drink.  Lambert and Payne then drove to a Wendy's restaurant to eat; as they sat in the parking lot, Payne fell briefly asleep and Lambert attempted to "poke him with a needle" containing heroin, but "he felt it, and he woke up."  (Tr. Vol. III, 493.)  Lambert later told Payne that she wanted to "get my stuff out of the apartment."  (Tr. Vol. III, 496.)

{¶ 48} They drove back to Williams' apartment, and Lambert went inside and told Williams that she could not "get him up here."  (Tr. Vol. III, 497.)  Williams responded: "Well, get him in the apartment building at least."  (Tr. Vol. III, 497.)  Earlier in the day, Williams had asked Lambert "if it was okay if it was [appellant] that did it.  And I said yeah."  (Tr. Vol. III, 497.)  Williams "needed to go get [appellant]," who was at "his girlfriend's house * * * in Whitehall, so he asked me if we could go pick up [appellant], and I said yes."  (Tr. Vol. III, 497.)  Lambert went downstairs and asked Payne "if we could go pick up [appellant]."  (Tr. Vol. III, 498.)  Payne agreed, and drove Lambert and Williams to a residence in Whitehall to pick up appellant.  After returning to Williams' apartment, Williams and appellant exited the Yukon and went upstairs; Lambert remained in the vehicle with Payne because he did not want to go inside.  Lambert, however, "grabbed the keys out of the truck so he couldn't leave."  (Tr. Vol. III, 500.)

{¶ 49} Lambert then said: "Okay.  Well, I'm going to go up there and get my stuff.  Will you help me at least carry my stuff out?"  Payne "said he would."  (Tr. Vol. III, 500.)  Payne got out of the vehicle but refused to go upstairs.  Lambert went upstairs to the apartment and Dalton was inside.  Williams told Lambert that "[appellant] wanted to strangle him because he's never strangled anybody before."  (Tr. Vol. III, 501.)  Lambert said "okay.  And I turned around and looked, like, 'Here, use this.'  Like, I was * * * looking for something to grab.  And he said he had it.  He's like, 'No, we got it.  It's okay.' " (Tr. Vol. III, 501.)

{¶ 50} Lambert went outside and told Payne to "[c]ome up here and help me carry this stuff. It's heavy." (Tr. Vol. III, 502.) Lambert and Payne walked upstairs together, and "when we get up there, [Williams] grabs him." (Tr. Vol. III, 502.) Williams had a gun in his hand. Williams "told him to get in the house," but Payne "started struggling right away." (Tr. Vol. III, 502.) Lambert put her hand over Payne's mouth "because he was trying to make noise." (Tr. Vol. III, 503.) Lambert saw appellant look out the door, and she told him to "come here and help. So he came out and grabbed [Payne] too." (Tr. Vol. III, 503.) Williams and Lambert were able to get Payne inside "with [appellant's] help." (Tr. Vol. III, 503.)

{¶ 51} Once inside, Williams and appellant took Payne down the hallway and back to the bathroom. Appellant had a gun in his hand, and Payne "struggled the whole time." (Tr. Vol. III, 504.) Williams "had gotten the money from out of [Payne's] pocket," and "he came out counting it out of the bathroom." (Tr. Vol. III, 505.) As Payne struggled, Williams and appellant kept pushing him back inside the bathroom. Williams returned to the bathroom, but Payne managed to get out into the hallway.

{¶ 52} Lambert then observed "[appellant] in the hallway with [Payne] with the cord around his neck." (Tr. Vol. III, 507.) Lambert asked Williams and appellant if they wanted her to help get Payne to the ground, and "[appellant] said yes." (Tr. Vol. III, 508.) Lambert "helped take his legs out so they could get him to the ground." (Tr. Vol. III, 508.) Williams started to kick Payne, and he "[k]icked him quite a few times." (Tr. Vol. III, 508.) Appellant was "strangling him" with the cord; "[t]he way it was tied, he pulled it. And it was choking him, tight around his neck." (Tr. Vol. III, 509.) Payne "was struggling. At the time [Williams] was kicking him." (Tr. Vol. III, 510.) Appellant "[j]ust continued to strangle him," and "it felt like it took forever." (Tr. Vol. III, 510-11.) According to Lambert, appellant "enjoyed looking into [Payne's] eyes while he passed away." (Tr. Vol. III, 511.)

{¶ 53} Dalton was seated on the couch during the incident. After appellant finished strangling Payne, Williams "was really pumped up and excited." (Tr. Vol. III, 512.) Lambert then cut Payne's fingernails and cleaned them because she "thought that he had scratched me." (Tr. Vol. III, 514.) Lambert "didn't want my DNA on his fingers." (Tr. Vol. III, 514.)

{¶ 54} That evening, Williams and Lambert went to a "Deals" dollar store to purchase cleaning supplies "to clean up the apartment." (Tr. Vol. III, 515.) They purchased a quilt, trash bags, a floor brush, all purpose cleaner and bleach. At trial, Lambert identified photographs introduced by the state depicting her and Williams inside the store on October 19, 2012. The state also introduced a video taken from the store on that date, and Lambert identified herself and Williams in the video. When Williams and Lambert returned from the store, Bagley and David were at the apartment. Appellant and Dalton left the apartment together that evening. Later, Lambert cut Payne's clothing off because she "didn't want there to be any fibers on his clothes in the apartment." (Tr. Vol. III, 519.) They wrapped Payne's body in a blanket and trash bags.

{¶ 55} Lambert wanted Bagley to "dump" the body near some apartments in a "bad neighborhood" so it might appear "he got robbed or something." (Tr. Vol. III, 521.) Bagley drove away in the Yukon with the body. Later, Bagley and Lambert took Williams to the airport. Lambert and Bagley returned to Williams' apartment and "[u]sed some more drugs." Williams "had left me and [Bagley] with some heroin, and we just kind of sat and chilled." (Tr. Vol. III, 523.)

{¶ 56} Lambert testified that David "was kind of acting fidgety about everything," and she mentioned to Williams that they should probably "do something to take care of him because she thought he was going to tell." (Tr. Vol. III, 524.) Lambert meant that they should "kill him because I thought he was going to tell. And [Williams] agreed. And he told me to call [appellant]." (Tr. Vol. III, 524.)

{¶ 57} Lambert called appellant the next day, and "he was coming over." (Tr. Vol. III, 524.) Lambert told Bagley that they needed to dispose of the "cord, clothes, just everything." (Tr. Vol. III, 524.) As Bagley was taking a trash bag outside, they encountered Whitehall police detectives. Lambert told detectives her name was "Faustina Friley. And then they said no, now, you're Amy Lambert." (Tr. Vol. III, 525.) Detectives also detained Bagley. The apartment door had been left open, and detectives began to question Lambert about what had happened. She then "started crying and saying that they had kidnapped me and forced me to be part of the whole thing." (Tr. Vol. III, 526.) Lambert told detectives that "[Williams] and [appellant] were responsible" for the murder, and she lied about her involvement. (Tr. Vol. III, 526.)

{¶ 58} Initially, detectives believed that Lambert was not involved, and they arranged for her to stay at her grandfather's residence. After her grandfather went to sleep that evening, Lambert "stole his car and some money from him, and * * * left." (Tr. Vol. III, 527.) Lambert fled the state, traveling with a woman named Michelle. Lambert spoke on the phone with Williams, and he told her to "pick him up in Florida," and she "said okay." (Tr. Vol. III, 528.) Law enforcement personnel subsequently arrested Lambert in Florida.

{¶ 59} Dr. Kenneth Gerston, a forensic pathologist with the Franklin County Coroner's Office, conducted the autopsy of Payne and prepared an autopsy report. Dr. Gerston testified that the cause of death was ligature strangulation, and the "manner" of death was "homicide." (Tr. Vol. III, 539.) He defined "ligature" as "a kind of a string or a cord that is usually used around the victim's neck to cut off circulation of blood to the brain or from the brain or both." (Tr. Vol. III, 539.) At trial, he identified photographs taken of the victim during the autopsy.

{¶ 60} Dr. Gerston noted a "ligature furrow" on the victim's neck, which he described as "an impression made on the skin by some type of cord or * * * rope." (Tr. Vol. III, 543.) The physician noted three furrows, indicating that "the string or cord used to produce these marks was wrapped around his neck three times." (Tr. Vol. III, 543.) There was evidence of blunt force injury to the victim's face, including a black eye (injury to the left orbit), and a contusion to the forehead and neck area, consistent with being punched or kicked. Dr. Gerston also noted possible nail marks, suggesting that "[t]he victim would be struggling." (Tr. Vol. III, 544.) Dr. Gerston testified that the contusions would have been inflicted before death. Dr. Gerston cited a hemorrhage to the anterior (front part) of the victim's neck muscles, indicating a great amount of force. Dr. Gerston identified the state's exhibit No. H-16, a cord, as the type of instrument consistent with the injury to Payne.

{¶ 61} Sarah Smith, a DNA analyst with BCI, conducted analysis of items recovered in this case, including an HDMI cord, a pair of gray sweatpants, and a pair of jeans. A DNA profile taken from the HDMI cable was consistent with a sample taken from the victim. A blood stain on the sweatpants was consistent with the victim's DNA, as was a blood stain on the jeans.

{¶ 62} Williams, age 20, testified on his own behalf.  His nickname is "Max."  (Tr. Vol. IV, 695.)  Williams has known appellant his "whole life."  (Tr. Vol. IV, 698.)  In October 2012, Williams resided at the Embassy Plaza Apartments.  Williams sold heroin "basically to make a living," and he also "funded theft rings." (Tr. Vol. IV, 699.)

{¶ 63} Williams first met Payne in August 2012 through Lambert.  Payne "would pay a fair share of [Lambert's] debt * * * on a weekly or biweekly basis."  (Tr. Vol. IV, 700.)  Williams knew about Payne's insurance policy.  Williams testified that in late September or early October, Lambert mentioned to him that " '[Payne] has that policy out on me.' * * * And she's like, 'Well, I want to kill him for the money, and I want you to * * * do it.' " (Tr. Vol. IV, 702-03.)  Williams testified that his response was: "Hell, no."   (Tr. Vol. VI, 703.)  Lambert raised the issue "[q]uite a few times * * * over the span of the next couple weeks." (Tr. Vol. IV, 703.)

{¶ 64} Williams gave the following account of the events on October 19, 2012.  That morning, a number of individuals were at his apartment, including Lambert, Payne, Bagley, David, and Dalton.  Lambert came into Williams' room about noon "for me to give her some dope."  (Tr. Vol. IV, 705.)  Later in the afternoon, around 3:00 or 4:00 p.m., "she came back * * * to buy some more dope."  (Tr. Vol. IV, 705.)  Dalton was still at the apartment "[c]hilling, smoking weed, hanging out, drinking."  (Tr. Vol. IV, 706.)  Williams denied knowing anything about a plan to kill Payne.

{¶ 65} That afternoon, "[appellant] had called me and said he was * * * trying to come back over to the house."  (Tr. Vol. IV, 707.)  Williams testified that "Amy walks in a little later.  And I go outside with Amy and * * * asked [Payne] to go take me over somewhere to pick up my brother."  (Tr. Vol. IV, 707.)  By brother, Williams was referring to appellant.  Payne agreed to take them to pick up appellant.  Williams stated that he had a conversation in the vehicle with Payne in which Payne indicated he could not pay any money that day on behalf of Lambert.  Williams "told him we would talk about it when I get back to the house."  (Tr. Vol. IV, 709.)  They returned to the apartment, and Williams had another conversation with Payne about money.  Williams testified that "[i]t didn't affect me if he paid then and there or not."  (Tr. Vol. IV, 710.)  Williams denied pulling a weapon on Payne, and he did not "recall" having a weapon at the time.  (Tr. Vol. IV, 710.)

{¶ 66} Williams denied forcing Payne inside his apartment. When asked during direct examination as to how Payne ended up inside his apartment, Williams testified that Lambert "was standing at the doorway while me and [Payne] was talking, and she just started going off * * * like, 'F you, [Payne]. I need my money now. No, I need my money now.' * * * And then * * * [appellant] came * * * out of the apartment." (Tr. Vol. IV, 712.) Williams testified that [appellant] had a weapon and "walked [Payne] in the house." (Tr. Vol. IV, 712.) According to Williams, appellant, Payne, and Amy were involved in "a bit of a struggle." (Tr. Vol. IV, 713.) Williams stated he was "walking in * * * directly behind him." (Tr. Vol. IV, 713.) Dalton was inside the apartment sitting next to a computer. Williams testified that Lambert, appellant, and Payne "just walked into the bathroom." (Tr. Vol. IV, 715.) According to Williams, he sat down in the living room and could not see what was going on inside the bathroom because "[t]he door was closed." (Tr. Vol. IV, 717.) He heard "a few noises" coming from the bathroom, describing it as "[a] bit of hollering and sounded like a scuffle." (Tr. Vol. IV, 717.)

{¶ 67} Williams testified that he got up and started walking toward the bedroom "to grab me a cigar, I smoke weed." (Tr. Vol. IV, 718.) As he was "coming back down the hallway, everybody bust[ed] out the bathroom." (Tr. Vol. IV, 718.) According to Williams, "[t]hey just all three came out. Like basically all three just came out at once." (Tr. Vol. IV, 718.) Williams testified that "Amy was trying to punch [Payne]. And [appellant] had * * * some cord wrapped around [Payne]." (Tr. Vol. IV, 719.) Williams related that he "made it back to the couch" by the time Payne ended up on the ground. (Tr. Vol. IV, 720.) Williams stated that "Amy just * * * started kicking [Payne], just kicking him, kicking him. And [appellant] just continued doing what he was doing." (Tr. Vol. IV, 720.) Williams testified that he did not attempt to stop the fight because "I ain't had nothing to do with it, and I didn't want nothing to do with it." (Tr. Vol. IV, 721.)

{¶ 68} After it became clear that Payne was dead, Williams "rolled another blunt. And I let * * * my brother know it was all right, you know. Let him know everything was all right and I told him I was going to take care of everything for him." (Tr. Vol. IV, 721.) Williams stated he did not "physically help out" with cleaning the apartment, but he "bought the cleaning supplies and blanket and stuff like that." (Tr. Vol. IV, 723.) He instructed Lambert, Bagley, and David about cleaning up the apartment. Williams stated

that he "did drive the truck to the back of the building and held the door open" while the body was loaded. (Tr. Vol. IV, 724.)

{¶ 69} Early the next morning, Williams went to the airport and took a flight to Miami for a Carnival Cruise with family members. When the boat docked in Cozumel, Mexico, Williams learned there was a warrant for his arrest. Williams "just didn't get back on the boat." He "wasn't ready to deal with all of this." (Tr. Vol. IV, 727.) According to Williams, "once I got off the boat, I was like just wait it out. It will blow over." (Tr. Vol. IV, 727.) He was arrested in Mexico a few days later.

{¶ 70} On cross-examination, when asked whether the state's exhibit No. C-116 was his firearm, Williams responded: "You could say it's mine, but it's more like of a house gun." (Tr. Vol. IV, 731.) When asked why he did not contact police after the murder, Williams said: "I ain't want to get nobody in trouble. You know, I just thought we would put everything behind us." (Tr. Vol. IV, 742.) Williams acknowledged that he was attempting to call appellant around 5:00 p.m. on the date of the incident. When asked why he kept calling him, Williams responded: "That was for directions. He gave horrible directions." (Tr. Vol. IV, 753.)

{¶ 71} Following deliberations, the jury returned verdicts finding appellant guilty of both counts of aggravated murder, kidnapping, and aggravated robbery. The jury also returned verdicts finding Williams guilty of two counts of aggravated murder, aggravated robbery, kidnapping, and tampering with evidence. By judgment entry filed December 19, 2014, the trial court sentenced appellant to life in prison without parole on the merged murder counts, and ten years each on the aggravated robbery and kidnapping counts, the latter two counts running concurrently to each other.

{¶ 72} On appeal, appellant sets forth the following two assignments of error for this court's review:

> [I.] [Appellant's] right to a fair trial guaranteed by the Sixth Amendment and the Fourteenth Amendment was violated by the ineffectiveness of his trial counsel in failing to challenge the admission of [appellant's] jeans and of cards bearing the victim's name, which the State obtained by "unreasonable searches" that violated the Fourth Amendment.

> [II.] The judgment is contrary to the manifest weight of the evidence.

{¶ 73} For purposes of review, we will address appellant's assignments of error in inverse order. Under his second assignment of error, appellant challenges his convictions as against the manifest weight of the evidence.

{¶ 74} We note that appellant does not challenge the sufficiency of the evidence supporting his convictions (i.e., requiring a court to determine whether, after viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt). *See, e.g.*, *State v. Kirkland*, 140 Ohio St.3d 73, 2014-Ohio-1966, ¶ 132. Rather, appellant argues that his convictions are against the manifest weight of the evidence because the testimony of the state's witnesses was not trustworthy. Specifically, appellant contends there are sufficient problems with the credibility of the testimony of the three primary witnesses, Lambert, Dalton, and Williams, such that the manifest weight of the evidence does not support the convictions.

{¶ 75} Under Ohio law, "[t]he weight of the evidence concerns the inclination of the greater amount of credible evidence offered to support one side of the issue rather than the other." *State v. Boone,* 10th Dist. No. 14AP-87, 2015-Ohio-2648, ¶ 49, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). In considering a manifest weight challenge, "an appellate court may not merely substitute its view for that of the trier of fact." *Id.* Rather, we must "review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id.* The power of a reviewing court to reverse a conviction as against the manifest weight of the evidence "must be exercised with caution," and such a reversal "is granted only in the most 'exceptional case in which the evidence weighs heavily against the conviction.' " *State v. Brown,* 8th Dist. No. 98881, 2013-Ohio-2690, ¶ 27, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 76} R.C. 2911.01 defines the offense of aggravated robbery in part as follows: "No person, in attempting or committing a theft offense, * * * or in fleeing immediately after the attempt or offense, shall * * * [i]nflict, or attempt to inflict, serious physical harm on another." R.C. 2911.01(A)(3). The offense of kidnapping is set forth under R.C.

2905.01, which states in part:  "No person, by force, threat, or deception, * * * shall remove another from the place where the other person is found or restrain the liberty of the other person, * * * [t]o facilitate the commission of any felony or flight thereafter." R.C. 2905.01(A)(2).

{¶ 77} R.C. 2903.01(A) defines the offense of aggravated murder, and states in part: "No person shall purposely, and with prior calculation and design, cause the death of another."  R.C. 2903.01(B) provides in relevant part: "No person shall purposely cause the death of another * * * while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, kidnapping, * * * aggravated robbery."

{¶ 78}  The state's primary evidence regarding the strangulation death of Payne came from the testimony of Dalton and Lambert.  As noted under the facts, Lambert testified as to discussions she had with Williams about a plan to kill Payne in order to collect on a life insurance policy Payne had purchased naming Lambert as the sole beneficiary.  Williams, who was leaving for a cruise on October 20, 2012, wanted to "get it done before the cruise."  (Tr. Vol. III, 478.)  The plan was to lure Payne to Williams' apartment.

{¶ 79} On October 19, 2012, Williams instructed Lambert to find a way to get Payne inside the apartment.  Lambert testified that Williams had asked her that day "if it was okay if it was [appellant] that did it."  (Tr. Vol. III, 497.)  Lambert convinced Payne to drive her to Williams' apartment that afternoon under the pretense that she wanted to "get [her] stuff out of the apartment."  (Tr. Vol. III, 496.)  Payne, however, did not want to go inside the apartment.  Williams then told Lambert that he needed to go get appellant who was at his girlfriend's house.  Payne agreed to drive Lambert and Williams to the residence to pick up appellant.  When they returned to Williams' apartment, Williams and appellant went inside, but Payne remained in the vehicle.  Lambert went upstairs and told Williams that Payne was reluctant to come upstairs.  According to Lambert, Williams told her that "[Appellant] wanted to strangle him because he's never strangled anybody before," and Lambert responded "okay." (Tr. Vol. III, 501.)

{¶ 80} Lambert then went outside and asked Payne to come upstairs in order to help her carry items from the apartment.  Lambert and Payne walked up the steps

together; Williams, who had a firearm, came outside and grabbed Payne, telling him to get inside. Payne, however, immediately began to struggle with Williams. Lambert observed appellant looking out the door, and she told him to "come here and help." (Tr. Vol. III, 503.) Lambert testified that appellant came outside and "grabbed [Payne] too." (Tr. Vol. III, 503.)

{¶ 81} Appellant and Williams managed to get Payne inside, and they struggled to force him down the hallway to the bathroom. Williams, who was able to get money from Payne's pocket, came out of the bathroom counting it. Payne then managed to exit the bathroom to the hallway, where Lambert observed appellant "with the cord around [Payne's] neck." (Tr. Vol. III, 507.) Lambert helped "take [Payne's] legs out" so they could get him to the ground. (Tr. Vol. III, 508.) Williams was kicking Payne while appellant tied the cord around his neck and began strangling him. Payne struggled for a while but eventually lost consciousness. According to Lambert, appellant "enjoyed" looking into Payne's eyes "while he passed away." (Tr. Vol. III, 511.)

{¶ 82} Dalton provided eyewitness testimony consistent with Lambert's version of the events. Dalton related that he was inside Williams' apartment when he heard a male screaming outside. Dalton testified that Lambert came inside the apartment "looking for something," similar to Lambert's account that she attempted to locate something in the apartment that could be used to strangle Payne. (Tr. Vol. II, 251.) A short time later, appellant and Williams forced Payne inside the apartment and "were jumping him." (Tr. Vol. II, 253.) Williams and appellant took Payne to the bathroom; the assailants put a backpack over Payne's head, and they were "punching and kicking" him. (Tr. Vol. II, 254.) Dalton observed Payne on the floor, and appellant was strangling him with a cord. Payne attempted to "fight back," but eventually lost consciousness. (Tr. Vol. II, 257.) Dalton remained seated on the couch during the events because he was scared.

{¶ 83} As noted, appellant's principal contention is that the above testimony of Dalton and Lambert was not credible. Appellant argues that Lambert had a motive to falsely incriminate him, and appellant suggests that Dalton's demeanor in the courtroom indicated he was in fear of Williams. Appellant also argues there were inconsistencies between the testimonies of Dalton and other witnesses, including a conflict as to whether Dalton stayed at Williams' apartment the night before the murder.

{¶ 84} Based on this court's review of the record, we find that the jury could have reasonably believed the state's version of events regarding appellant's role in the strangulation death of Payne. At trial, the jury heard Lambert acknowledge that she lied to detectives about her involvement when initially arrested, and the jury was also aware she had entered into a plea agreement with the state. During cross-examination, the respective defense counsel questioned her extensively regarding those matters. Here, it was within the province of the jury to determine whether Lambert's testimony was credible in light of her proffer and plea agreement. *See State v. Rankin,* 10th Dist. No. 10AP-1118, 2011-Ohio-5131, ¶ 30 (jury members, which heard details of plea agreement and favorable sentencing recommendation, were free to determine whether testimony of witness was credible in light of the considerations she received for testifying); *State v. Caldwell,* 2d Dist. No. 2013-CA-76, 2015-Ohio-2551, ¶ 36 ("the jury is free to decide whether the witness's testimony is credible in view of the consideration he or she has received for testifying"). Similarly, it was within the province of the jury to assess whether Dalton, an acknowledged friend of appellant, was motivated to testify against him out of fear of retaliation by Williams.

{¶ 85} We note that, in addition to the testimony of Lambert and Dalton, the state presented other testimony, as well as physical and forensic evidence, consistent with its theory of the case regarding appellant's involvement. Both Bagley and David testified that, upon returning to the apartment that evening following their trip to Marysville, appellant was inside the apartment with the deceased victim. According to Bagley, appellant was "surprised" when he and David arrived at the apartment. Bagley observed the body in the hallway and recognized the victim as Payne. Appellant, who was holding a gun at the time, told Bagley to help. Bagley later drove appellant and Dalton to a residence, during which appellant told Bagley: "Don't tell, man. I want to watch my kids grow up." (Tr. Vol. II, 341.) David also recounted arriving at the apartment that night and observing a body on the floor in the hallway, and appellant holding a weapon.

{¶ 86} Dr. Gerston testified that the cause of death was ligature strangulation. He identified blunt force injuries to the victim, and stated that the injuries were consistent with the victim having been punched or kicked. Dr. Gerston noted three furrow marks on the victim's neck, indicating that the cord may have been wrapped around his neck three

times.  The injuries were also consistent with someone who had been struggling, including nail marks near the victim's neck, suggesting the victim attempted to loosen the cord during the incident.  Dr. Gerston stated that the injury caused to the victim was consistent with strangulation by the type of instrument (i.e., the HDMI cord) admitted at trial and identified by Lambert as the cord used by appellant to strangle the victim.  The state also introduced the cell phone records of appellant and Williams, reflecting that Williams placed calls to appellant throughout the day of the murder.

{¶ 87} As noted, appellant assails the motivations of Lambert, and portrays the remaining witnesses as not trustworthy.  Under Ohio law, however, "[t]he jury is free to believe or disbelieve any or all of a witnesses' testimony." *State v. Hudson,* 10th Dist. No. 06AP-335, 2007-Ohio-3227, ¶ 18.  Further, with respect to appellant's claim regarding some inconsistencies in the testimony, "[a] defendant is not entitled to a reversal on manifest weight grounds simply because there was inconsistent evidence presented at trial." *State v. McDowell,* 10th Dist. No. 10AP-509, 2011-Ohio-6815, ¶ 61.  Rather, "[t]he trier of fact is in the best position to take into account any inconsistencies, along with the witnesses' demeanor and manner of testifying, and determine whether or not the witnesses' testimony is credible." *Id.*

{¶ 88} Upon review of the record, the state presented sufficient, competent, credible evidence to permit reasonable minds to find appellant guilty beyond a reasonable doubt of aggravated murder, aggravated robbery, and kidnapping.  Given the substantial evidence against appellant, we find that the jury did not lose its way and create a manifest miscarriage of justice.  Thus, the verdicts are not against the manifest weight of the evidence.

{¶ 89} Accordingly, appellant's second assignment of error is not well-taken and is overruled.

{¶ 90} Under his first assignment of error, appellant contends his trial counsel was ineffective in failing to file a motion to suppress evidence obtained by police, including a pair of jeans belonging to appellant containing a spot of the victim's blood, and cards bearing the victim's name found in appellant's backpack.  Appellant, who argues that the above items constituted the only physical evidence linking him to the crime, notes that the jeans were in a large bag of clothes found at the home of his mother, while the backpack

was obtained from the home of Dalton's mother, where appellant had been residing at the time of the incident. Appellant argues that police officers seized the bags of personal items and backpack without obtaining search warrants, in violation of the Fourth Amendment and, therefore, the fruits of the searches would have probably been excluded from trial had his trial counsel filed a motion to suppress.

{¶ 91} In response, the state argues that experienced counsel represented appellant and that counsel likely did not pursue a motion to suppress based on the belief it lacked merit and would not be successful. Specifically, as to the items turned over by appellant's mother, the state contends appellant had no reasonable expectation of privacy with respect to clothing found in an outside shed; further, the state maintains, appellant's mother had common authority over the premises to consent to the search. As to the backpack turned over by Dalton's mother, the state argues that the evidence indicates appellant was no longer staying at that residence and that he abandoned the property.

{¶ 92} In order to prove ineffective assistance of counsel, a defendant must satisfy the two-pronged test of *Strickland v. Washington,* 466 U.S. 668 (1984), requiring the defendant to first "establish that counsel's performance was deficient, and second, the deficient performance prejudiced the defense." *State v. Riley,* 7th Dist. No. 13 MA 180, 2015-Ohio-94, ¶ 13, citing *Strickland* at 687. Under this test, "[e]ven if counsel's performance is considered deficient, a conviction cannot be reversed absent a determination that appellant was prejudiced." *Id.* A defendant seeking to establish prejudice as a result of trial counsel's deficient performance "must prove that there is a reasonable probability that but for counsel's serious error, the result of the trial would have been different." *Id.* An appellant "bears the burden of proof on the issue of counsel's ineffectiveness, and in Ohio, a licensed attorney is presumed competent." *Id.* at ¶ 15. Further, " 'strategic or tactical decisions will not form a basis for a claim of ineffective assistance of counsel.' " *Id.,* quoting *State v. Dickinson,* 7th Dist. No. 03 CO 52, 2004-Ohio-6373, ¶ 11.

{¶ 93} A trial counsel's failure to file a motion to suppress "does not necessarily constitute ineffective assistance of counsel." *Riley* at ¶ 17, citing *State v. Madrigal,* 87 Ohio St.3d 378, 389 (2000). Rather, counsel's failure to file a motion to suppress "may constitute ineffective assistance of counsel when the record demonstrates that the motion

would have been granted."  *Id.*, citing *State v. Barnett,* 7th Dist. No. 06-JE-23, 2008-Ohio-1546, ¶ 31.

{¶ 94} In general, "[t]he Fourth Amendment protects individuals from unreasonable search and seizure by the government."  *State v. Corbin,* 194 Ohio App.3d 720, 2011-Ohio-3491, ¶ 24 (6th Dist.).  In order to have standing to challenge a violation, however, "an individual must have a legitimate expectation of privacy in the subject matter of the search."  *Id.,* citing *Minnesota v. Olson,* 495 U.S. 91, 95-96 (1990).  It has been held that "[a] legitimate expectation of privacy is 'one that society is prepared to recognize as reasonable,' " and "[t]he burden is on the party asserting the motion to provide sufficient evidence to prove grounds for standing."  *Corbin* at ¶ 24, quoting *Rakas v. Illinois,* 439 U.S. 128, 143-44 (1978).

{¶ 95} In *Olson,* the United States Supreme Court recognized that "an individual's status as an overnight guest is alone enough to establish a reasonable expectation of privacy."  *Id.* at ¶ 25, citing *Olson* at 96-97.  The ruling in *Olson,* however, "is limited in that it does not apply to prior overnight guests, regardless of the level of frequency, who failed to present sufficient evidence to show that they were an overnight guest at the time of the search."  *Id.*, citing *State v. Davis,* 80 Ohio App.3d 277, 285 (8th Dist.1992).  When an individual is not an overnight guest at the time of the search, "courts look at the totality of the circumstances in making a determination."  *Id.* at ¶ 26.

{¶ 96} In the present case, regarding the items recovered from the home of appellant's mother, Detective Brown testified that appellant's mother "provided us with three black trash bags full of clothing and other personal items that she identified as belonging to her son." (Tr. Vol. I, 118-19.)  Appellant's mother told detectives that the clothing was "in a shed right outside the back door." (Tr. Vol. I, 148.)  According to Detective Brown, appellant's "younger sister took us to the shed, opened it, and retrieved those bags that mom said had been placed in there." (Tr. Vol. I, 148.)  Detective Brown did not recall whether the shed was locked.

{¶ 97} With respect to items obtained from the Dalton residence, Detective Brown testified that he received a phone call from Dalton's mother who told the detective that "she had some of [appellant's] personal effects that she didn't know what to do with." (Tr. Vol. I, 149.)  Detective Brown and another detective drove to the Dalton residence.

Dalton's mother "invited us in, and a black trash bag and the book bag were sitting on the floor right inside the front door." (Tr. Vol. I, 150.)

{¶ 98} One specifically established exception to the warrant requirement is "a search that is conducted with consent." *State v. Portman,* 2d Dist. No. 2013-CA-68, 2014-Ohio-4343, ¶ 11, citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 219 (1973). Further, "[c]onsent to search can be 'obtained, either from the individual whose property is searched, or from a third party who possesses common authority over the premises.' " *Portman* at ¶ 11, quoting *Illinois v. Rodriguez,* 497 U.S. 177, 181 (1990). Police officers "may conduct a search without a warrant so long as a third party who possesses common authority over the property voluntarily consents to the search." *State v. Reynolds,* 9th Dist. No. 19062 (Oct. 27, 1999), citing *United States v. Matlock,* 415 U.S. 164 (1974). It has been noted that " '[c]ommon authority' exists when two or more persons have joint access or control over the property, each has the right to consent to permit inspection, and each has assumed the risk that any one of them might so consent." *Reynolds,* quoting *Matlock* at 172.

{¶ 99} Under Ohio law, "a warrantless search based on consent by a third party who does not have common authority is valid if, at the time of the search, the police had evidence to support a reasonable belief that the third party had common authority." *Reynolds.* Thus, "[e]ven if an officer erroneously believes that a third-party is authorized to give consent, using an objective standard, third-party consent is valid if an officer looking at the then-available facts could reasonably conclude that the third-party had apparent authority to consent." *Portman* at ¶ 13.

{¶ 100} In a case cited by the state in the instant appeal, *State v. Helton,* 3d Dist. No. 8-92-18 (Feb. 19, 1993), police officers conducted a search of a residence owned by the defendant's sister, including a shed located on the property where the defendant kept his belongings. The defendant's sister had provided her consent to the search, and the defendant subsequently filed a motion to suppress, arguing that she lacked authority to give such consent. The trial court denied the motion, and the defendant challenged the court's ruling on appeal.

{¶ 101} In *Helton,* the court rejected the defendant's challenge, holding in part that the defendant "did not own or occupy the premises searched, nor did he have any

proprietary or property interest in the * * * shed * * * searched and he was not even present on the premises when the search was conducted." *Id.* The court, noting that the defendant's "single connection to the premises searched is that he is the brother of the owner/occupant," held that "[f]amilial status, by itself, does not grant standing to challenge a search and seizure." *Id.* Rather, the court held, without any relevant connection to the premises searched, the defendant lacked "a reasonable expectation of privacy in the areas searched that would allow him standing to challenge the voluntariness of his sister's consent." *Id.*

{¶ 102} The court in *Helton* also observed that, under the totality of the circumstances, the defendant's sister freely and voluntarily gave her consent to the search. On that issue, the court addressed and rejected the defendant's claim that he had exclusive control over the shed based on evidence he possessed the only key. The facts in *Helton* indicated that the lock was broken and the court noted that the defendant did not dispute "he did not have any lease agreement, formal or informal, with his sister which may have given him exclusive or common authority with his sister over the shed." *Id.* The court held that "[s]toring personal property in an unlocked shed located on another's premises, by itself, is insufficient to show that one has the requisite standing to challenge the search and seizure of items in the shed." *Id.* Further, the court concluded, even if the defendant "shared common authority over the shed with his sister, he assumed the risk that his sister, having such common authority, would give her valid consent to search the shed in which the incriminating items would be seized." *Id.*

{¶ 103} In the instant case, with respect to the items recovered from the shed located in the back of appellant's mother's residence, the evidence does not suggest that appellant was living at that residence, nor does the record reflect that he had any type of ownership interest in the house or shed. Further, there is no indication appellant's mother objected to the items taken from the shed; rather, the evidence suggests she had authority over the premises, and that she directed her daughter to take detectives to the shed where the items were located in trash bags. Under these circumstances, we cannot conclude that appellant has demonstrated his trial counsel would have been successful in filing a motion to suppress the evidence at issue. *See State v. Connors-Camp,* 2d Dist. No. 20850, 2006-Ohio-409, ¶ 32 (trial court did not err in denying the defendant's motion to

suppress where the defendant's mother consented to the search of her residence, the facts indicated the defendant did not reside at his mother's home and, even if he did reside there, no evidence indicated he paid rent or had a proprietary interest in the area searched).

{¶ 104} As to the items recovered from the Dalton residence, the evidence indicates appellant stayed with Robert Dalton at the home of Dalton's mother for approximately two months leading up to the time of the incident. According to the testimony of Dalton, the day after Payne's murder, appellant "packed up his stuff, and he left" the residence. (Tr. Vol. II, 260.) Two bags of appellant's items, however, remained in Dalton's room. We note there was no evidence that appellant ever returned to the Dalton residence, and appellant was not staying there at the time Dalton's mother, acting on her own initiative, contacted police and requested that they collect the items from her home.

{¶ 105} Here, the facts surrounding appellant's departure arguably raises questions as to whether he abandoned the property remaining at the Dalton residence and, therefore, whether he forfeited any reasonable expectation of privacy in the items. *See State v. Gould,* 131 Ohio St.3d 179, 2012-Ohio-71, ¶ 37 ("A person who abandons property has no objectively reasonable expectation of privacy in it," and "[a] warrantless search of abandoned property does not violate the Fourth Amendment because any expectation of privacy is forfeited upon abandonment."). Even accepting, however, that appellant could show he had a legitimate expectation of privacy in the property left behind, we find, based on the evidence available to detectives at the time they visited the Dalton residence, that it was reasonable for detectives to assume Dalton's mother had apparent authority to consent to entry into the residence to recover the items. *Reynolds; Portman* at ¶ 13.

{¶ 106} Upon review, appellant has failed to show a strong probability that the trial court should have granted a motion to suppress the subject evidence. Rather, trial counsel could have reasonably concluded that such a motion would have been futile. The failure to raise a meritless argument does not constitute ineffective assistance of counsel. *State v. Robinson,* 108 Ohio App.3d 428, 433 (3d Dist.1996) (failure of trial counsel to file a meritless motion to suppress not ineffective representation).

{¶ 107} More significantly, even assuming appellant could demonstrate deficient performance by his trial counsel in failing to file a motion to suppress, we agree with the state's contention that he cannot demonstrate prejudice based on the record presented. Rather, in light of the substantial evidence of appellant's guilt, as outlined above in addressing appellant's manifest weight challenge, it is not reasonably likely the outcome of the trial would have been different had counsel moved to suppress the evidence at issue.

{¶ 108} Accordingly, appellant's first assignment of error is not well-taken and is overruled.

{¶ 109} Based on the foregoing, appellant's first and second assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is hereby affirmed.

*Judgment affirmed.*

DORRIAN, P.J. and HORTON, J., concur.

_____